# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GREENSTAR TECHNOLOGIES, LLC AND PACIFIC CONTROLS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>JONES LANG LASALLE AMERICAS, INC.,<br><br>Defendant. | Civil Action No.: 3:20-cv-07900 (GC-TJB) |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Liza M. Walsh
Tricia B. O'Reilly
Mariel L. Belanger
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Tel: (973) 757-1100

*Attorneys for Defendant*
*Jones Lang LaSalle Americas, Inc.*

*On the Brief:*
Tricia B. O'Reilly
Mariel L. Belanger

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

RELEVANT FACTS & PROCEDURAL HISTORY .......................................... 3

LEGAL ARGUMENT ......................................................................................... 7

  A.  Standard of Review ..................................................................................... 7

  B.  Plaintiffs Cannot Allege A Plausible Breach of Contract Claim As To
The PCI Agreement ................................................................................... 10

      1.    The Greenstar Agreement Was A Novation That Extinguished
The PCI Agreement and All The Parties' Related Obligations ......... 10

      2.    JLL's Purported Failure To Market PCI's Technology Is Not A
Violation of any Provision of The PCI Agreement ........................... 14

  C.  Plaintiffs Fail To Allege A Plausible Breach of Contract Claim With
Respect To The Greenstar Agreement ....................................................... 19

  D.  Plaintiffs' Complaint Fails To State A Claim For An Accounting Under
Either Contract .......................................................................................... 22

  E.  Counts II, III, VI, VII, and IX Must Be Summarily Dismissed Because
They Seek To Raise Causes Of Action That Are Not Recognized By
Illinois Law ................................................................................................ 26

      1.    The Breach of The Implied Covenant Of Good Faith And Fair
Dealing Claims Fail As A Matter Of Law ......................................... 26

      2.    The Bad Faith Tort Claims Fail As A Matter Of Law ...................... 27

      3.    The Specific Performance Claim Fails As A Matter Of Law And
Is Moot ............................................................................................... 28

CONCLUSION ................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ABM Marking, Inc. v. Zanasi Fratelli*, *S.R.L.*,
   353 F.3d 541 (7th Cir. 2003) ................................................................23

*Allied Waste Transportation, Inc. v. John Sexton Sand &*
   *Gravel Corp.*,
   2016 WL 3443897 (N.D. Ill. June 23, 2016) ......................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................7, 20

*Ass'n, Inc. v. Capitol Bankers Life Ins. Co., Inc.*,
   832 F. Supp. 227 (N.D. Ill. 1993)........................................................24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................7

*Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough*
   *Prods., Inc.*,
   212 F.3d 373 (7th Cir. 2000)................................................................26

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006) ..............................................................8, 9

*Burke v. 401 N. Wabash Venture, LLC*,
    2010 WL 2330334 (N.D. Ill. June 9, 2010) ......................................15

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) .................................................................8

*Cincinnati Ins. Co. v. Leighton*,
   403 F.3d 879 (7th Cir. 2005)...............................................................11

*Corman v. Nationwide Life Ins. Co.*,
   396 F. Supp. 3d 530 (E.D. Pa. 2019)....................................................9

*County of L.A. v. Davis*,
   440 U.S. 625 (1979) ...........................................................................29

*Cramer v. Ins. Exchange Agency,*
  675 N.E.2d 897 (Ill. 1996)....................................................................................27

*Curtiss-Wright Corp. v. Rodney Hunt Co.,*
  1 F. Supp. 3d 277 (D.N.J. 2014).........................................................................11

*Dammer v. Travagline,*
  2021 WL 736376 (E.D. Pa. Feb. 25, 2021)..........................................................9

*Estate of Brown v. Arc Music Grp.,*
  830 F. Supp. 2d 501 (N.D. Ill. 2011)...................................................................25

*Fowler v. UPMC Shadyside,*
  578 F.3d 203 (3d Cir. 2009) ..................................................................................7

*Gould Elecs. Inc. v. United States,*
  220 F.3d 169 (3d Cir. 2000) ................................................................................10

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997) ................................................................................9

*In re Newport Plaza Assoc., L.P.,*
  985 F.2d 640 (1st Cir.1993) ................................................................................11

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.,*
  184 F.3d 280 (3d Cir. 1999) ..................................................................................8

*Instructional Sys., Inc. v. Comput. Curriculum Corp.,*
  614 A.2d 124 (N.J. 1992) ....................................................................................11

*Kanter v. Barella,*
  489 F.3d 170 (3d Cir. 2007) ..................................................................................8

*Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems,*
  428 F.3d 706 (7th Cir. 2005)................................................................... 23, 24, 25

*Lagen v. United Cont'l Holdings, Inc.,*
  920 F. Supp. 2d 912 (N.D. Ill. 2013)...................................................................28

*M Ganton Technologies, Inc. v. Quadion Corp.,*
  755 F. Supp. 203 (N.D.Ill.1990)..........................................................................28

*Mann v. Kemper Fin. Cos.,*
　618 N.E.2d 317 (Ill. App. Ct. 1st Dist. 1992) ................................................ 23, 24

*McArdle v. Peoria Sch. Dist. No. 150,*
　705 F.3d 751 (7th Cir. 2013) ...................................................................26

*Melikhov v. Drab,*
　2017 WL 3234808 (N.D. Ill. July 31, 2017) ................................................ 24, 25

*Mollett v. Leicth,*
　511 F. App'x 172 (3d Cir. 2013) ...........................................................10

*Moorman Manufacturing Co. v. National Tank Co.,*
　435 N.E.2d 443 (1982) .........................................................................27

*Oil Exp. Nat'l, Inc. v. Latos,*
　966 F. Supp. 650 (N.D. Ill. 1997)...........................................................25

*Ollivier v. Alden*,
　634 N.E.2d 418 (Ill. App. Ct. 2d Dist. 1994) ...................................................19

*Paramount Aviation Corp. v. Agusta*,
　178 F.3d 132 (3d Cir.1999) ....................................................................11

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
　998 F.2d 1192 (3d Cir.1993) ..................................................................8

*Petruska v. Gannon Univ.,*
　462 F.3d 294 (3d Cir. 2006) ..................................................................9

*Phillips & Arnold, Inc. v. Frederick J. Borgsmiller, Inc.,*
　462 N.E.2d 924 (Ill. App. Ct. 1st Dist. 1984) ...................................................11

*Reger Dev., LLC v. Nat'l City Bank,*
　592 F.3d 759 (7th Cir.2010) ................................................................ 14, 19

*Ronald McDonald House Charities of Chicagoland v. Winning*
　*Charities Illinois, LLC,*
　2013 WL 5907668 (N.D. Ill. Nov. 4, 2013).......................................................18

*Ruggiero v. Mount Nittany Med. Ctr.,*
　736 F. App'x 35 (3d Cir. 2018)...............................................................9

*Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.,*
   255 F.3d 397 (7th Cir. 2001) ...................................................................19

*United States Fid. & Guar. Co. v. Klein Corp.,*
   558 N.E.2d 1047 (Ill. App. Ct. 1st Dist. 1989) ......................................11

*United Steel Paper & Forestry Rubber Mfg. Allied Indus. &*
   *Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of the*
   *Virgin Islands,*
   842 F.3d 201 (3d Cir. 2016) .....................................................................28

*Vacuum Indus. Pollution, Inc. v. Union Oil Co. of California,*
   764 F. Supp. 507 (N.D. Ill. 1991) ...........................................................27

*Voles v. Sandia Mortgage Corp.,*
   751 N.E.2d 1126 (Ill. 2001) .....................................................................26

*W. Howard Corp. v. Indian Harbor Ins. Co.,*
   2011 WL 2582353 (N.D. Ill. June 29, 2011) .........................................27

*W.W. Vincent & Co. v. First Colony Life Ins. Co.,*
   814 N.E.2d 960 (Ill.2004)........................................................................14

*Zell v. Jacoby–Bender, Inc.,*
   542 F.2d 34 (7th Cir. 1976) ........................................................... 23, 25

**RULES**

Fed. R. Civ. P. 12(b)(1)...........................................................................9, 29

## PRELIMINARY STATEMENT

This matter arises out of the contractual relationship between Plaintiffs Pacific Controls, Inc. ("PCI") and its successor Greenstar Technologies LLC ("Greenstar") (collectively "Plaintiffs") and Jones Lang LaSalle Americas, Inc. ("JLL"), related to Plaintiffs' provision of software and a software platform, referred to by JLL as IntelliCommand. The relationship spanned nine years and two agreements – the first with PCI and the second with Greenstar. In April 2020, pursuant to the termination provisions in the Greenstar agreement, JLL informed Greenstar that it was terminating the relationship effective August 31, 2020. Thereafter, in an apparent tactical move aimed at gaining negotiating leverage in the sole business close-out issue – the valuation of the IntelliCommand business – Plaintiffs filed this lawsuit. Plaintiffs' Complaint asserts nine claims against JLL based on JLL's alleged bad faith and purported failure to fulfill its obligations under the parties' agreements. JLL now moves to dismiss Plaintiffs' Complaint in its entirety.

While Plaintiffs' allegations regarding JLL's purported conduct are false, even accepting them as true for purposes of this Motion, Plaintiffs' Complaint is facially deficient in all respects and must therefore be dismissed. First, Plaintiffs assert a breach of contract claim as to JLL's initial agreement with PCI (Count I), but it is clear both from the allegations in the Complaint and the plain language of the agreements that JLL's contract with PCI was extinguished and replaced by its

later contract with Greenstar. Thus, a novation occurred, barring any breach of contract claim, and all other related contractual claims, as to the PCI agreement. Moreover, even in the absence of a novation, Plaintiffs' claim fails because JLL's alleged failure to market PCI's technology does not violate any provision in the PCI agreement, nor have Plaintiffs identified a single contractual provision JLL purportedly breached.

Plaintiffs also assert a breach of contract claim as to the Greenstar agreement (Count VI), alleging that JLL failed to hold certain meetings and timely deliver certain information and reports as required. Plaintiffs' Complaint, however, fails to allege that Greenstar was actually damaged as a result of any purported failure by JLL to comply with any contractual provision, thus dooming the Greenstar breach of contract claim. Similarly, Plaintiffs assert claims for equitable accountings related to both agreements (Counts IV and VIII), but the Complaint does not contain any allegations that there is no adequate remedy at law, which is fatal to such claims.

Finally, Plaintiffs allege, and the parties' contracts make clear, that Illinois law governs the contracts. Nonetheless, Plaintiffs have pled claims for breach of the covenant of good faith and fair dealing (Counts II and VI), bad faith tort (Counts III and VII) and specific performance of the contractual provision requiring an independent valuation of IntelliCommand (Count IX), none of which are cognizable under Illinois law and must be dismissed. Moreover, Plaintiff's specific performance

claim is now moot as an independent valuation has been undertaken and has been concluded.

Therefore, Defendant JLL respectfully requests that the Court grant its Motion to Dismiss and dismiss Plaintiffs' Complaint, in its entirety, with prejudice.

## RELEVANT FACTS & PROCEDURAL HISTORY

This matter relates to a nine year contractual relationship between Plaintiffs and JLL whereby Plaintiffs agreed to provide certain software and services for use by JLL and its clients.[1] JLL is a commercial real estate services company that owns and manages commercial real estate across the world occupied by clients in a variety of different industries. (*See* Compl. ¶¶ 6-7). Both PCI and Greenstar, at all relevant times, provided "cloud technology services and materials to customers, including a platform, software and related services." (*Id.* at ¶ 4).

On October 11, 2011 PCI and JLL entered into an agreement (the "PCI Agreement") whereby PCI agreed to provide its software, platform and services to JLL and JLL customers which were to "integrate with building automated systems to deliver optimization and governance centric data." (*Id.* at ¶ 5); Declaration of Tricia B. O'Reilly ("O'Reilly Decl."), ¶ 3, Exhibit A, PCI Agreement.[2] Pursuant to

---

[1] For the purposes of this motion only, JLL accepts Plaintiffs' allegations as true. *See* Fed. R. Civ. P. 12(b)(6). Recitation of Plaintiff's version of the facts for purposes of this Motion should not be deemed an admission of same.

[2] As the Complaint references and relies upon the PCI Agreement (and the Greenstar

the PCI Agreement, JLL would provide PCI with a work order setting forth the software and services requested at any given client site, and PCI would establish a separate account for billing and invoicing each JLL client for its software, platform and services. (Compl. ¶ 8); O'Reilly Decl., Ex. A, § 2.3.

PCI alleges that JLL represented that it would "aggressively market PCI's services to its customers," and as a result of this representation, PCI "expended substantial sums, energy and resources." (Compl. ¶ 7, 13). PCI alleges that JLL failed to treat it fairly and to market PCI's software, platform, and services as agreed, and PCI therefore incurred substantial losses. (*Id.* at ¶¶ 14-15). PCI further alleges that because "it could no longer afford to maintain its efforts with respect to the software, platform and services," PCI "proposed that JLL consider entering into an agreement with respect thereto with" Greenstar. (*Id.* at ¶ 16).

On September 1, 2016, JLL entered into an Interim Teaming Agreement (the "Greenstar Agreement") with Greenstar, the "successor entity" to PCI and subsequent owner of PCI's software and platform, so as to continue to secure use of the software and platform, which JLL referred to as "IntelliCommand". O'Reilly Decl., ¶ 4, Ex. B, Greenstar Agreement. (*See also* Compl. ¶ 17-18). Pursuant to the Greenstar Agreement, JLL was to "establish an IntelliCommand Management Team

---

Agreement), this Court may consider the Agreements in assessing this Motion to Dismiss without converting it to a motion for summary judgment. *See* Point A, *infra.*

('IMT') comprised of JLL employees to oversee and control all business operations for IntelliCommand, . . . and all related hardware and software [] necessary to deliver IntelliCommand to clients." O'Reilly Decl., Ex. B, § 1. As a result of JLL taking over the day to day management of IntelliCommand, the parties agreed that JLL would receive 65% of the net proceeds from IntelliCommand sales and services and Greenstar would receive 35%. *Id.* at § 1.1. If IntelliCommand incurred losses, those losses would also be split in the same way, with Greenstar paying to JLL 35% of any IntelliCommand loss. *Id.* On June 14, 2017, the parties entered into a Letter Amendment extending the term of the Greenstar Agreement to automatically renew for additional one-year terms unless either party provided 120 days-notice of a non-renewal. O'Reilly Decl., ¶ 5, Ex. C.

Plaintiffs allege that JLL breached the Greenstar Agreement by, among other things, failing to hold meetings and provide monthly and quarterly reports and budgets. (*See* Compl. ¶ 75-76). Ultimately, on April 28, 2020, JLL provided notice of its intention to terminate the agreement effective August 31, 2020. (*Id.* at ¶ 90). Plaintiffs claim JLL failed to comply with the "Termination" provision of the Greenstar Agreement, which requires a valuation of IMT and payment of 35% of the value of the IMT to Greenstar; and instead, offered to buy out Greenstar "free of cost." (*Id.* at ¶¶ 76, 91-93); O'Reilly Decl., Ex. B, § 10. Finally, Plaintiffs allege that JLL's course of conduct over the years shows that it planned to get IntelliCommand

"within its exclusive control and to 'steal' it away from first PCI and then Greenstar."
(Compl. ¶ 53).

Plaintiffs filed this lawsuit in New Jersey Superior Court, Somerset County,
on June 1, 2020. JLL removed the matter to this Court on June 29, 2020 as there is
complete diversity between the parties.

On July 15, 2020, the Court entered a Letter Order granting JLL's request for
an extension of time to respond to the Complaint so that the parties could engage in
settlement discussions. (Electronic Court Filing ("ECF") 8). On September 2, 2020,
a status conference was held before Judge Bongiovanni and the parties agreed to
engage in the valuation process required by the "Termination" provision of the
Greenstar agreement. (ECF 9 & minute entry; Compl. ¶¶ 76, 91-93); O'Reilly Decl.,
Ex. B, § 10. Thereafter, the parties negotiated a valuation protocol to govern the
valuation (ECF 11), agreed upon the retention of a valuation expert (ECF 12) and
provided the Court with periodic updates on the status of the valuation process (ECF
15, 17, 20 (& minute entry) 22, 23, 24, 25). The Court's Text Orders made clear that
"[n]o motions shall be filed  . . . without prior approval" while the valuation process
was ongoing. (ECF 11, 12).

After receiving the final valuation report (see ECF 24, 25, 27, (6/2/22 Minute
Entry), the parties attended an in-person settlement conference with Judge
Bongiovanni on December 6, 2022 (ECF 28, 29, 30). As those discussions were not

fruitful, on December 28, 2022, the Court entered a Text Order directing JLL to file its Motion to Dismiss no later than February 3, 2023. (ECF 31).

Because Plaintiffs' Complaint fails to allege facts to plausibly plead the claims asserted and contains numerous causes of action that are not viable under Illinois law (and are now moot), JLL's Motion to Dismiss, respectfully, should be granted.

## LEGAL ARGUMENT

### A.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) a party may move to dismiss a pleading for "failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs' "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  For a claim to be "plausible on its face," Plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  Additionally, this Court may disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. The same is true of "legal conclusions" that are not "supported by factual allegations." *Id.*; *see also Burtch v.*

*Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("[M]ere restatements of the elements of [a] claim[] . . . are not entitled to the assumption of truth." (alterations in original) (quotation omitted)); *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007) (holding that the court need not credit "bald assertions" or "legal conclusions").

Although the court generally must confine its review on a Rule 12(b)(6) motion to the pleadings, "a court may consider certain narrowly defined types of material" beyond the pleadings, *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 184 F.3d 280, 287 (3d Cir. 1999), including any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation and citation omitted).

To that end, a court may consider, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir.1993). "The Third Circuit has explained that '[t]he rationale underlying this [rule] is that the primary problem raised by looking to documents outside the complaint [is] lack of notice to the plaintiff," and that this problem "is dissipated where the plaintiff has actual notice and has relied upon these documents in framing the complaint." *Corman v. Nationwide Life Ins. Co.,* 396 F.

Supp. 3d 530, 535-36 (E.D. Pa. 2019) (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997)). Therefore, in assessing Plaintiffs' allegations and claims pertaining to the PCI Agreement and Greenstar Agreement (some provisions of which are quoted in the Complaint), the Court may consider those Agreements (which JLL has attached to this Motion) without converting this Motion to a Motion for Summary Judgment. *See e.g., Ruggiero v. Mount Nittany Med. Ctr.,* 736 F. App'x 35, 37 n.1 (3d Cir. 2018) ("To the extent passages are excerpted from documents not attached to the complaint, we consider them because the documents were integral to and explicitly relied upon in the complaint.").

Moreover, the Court may also consider the public docket of this matter and the ECF status updates, Orders and Text Orders entered to date as such matters are "items appearing in the record of th[is] case" and matters of public record. *Buck,* 452 F.3d at 260. *See also Dammer v. Travagline,* No. CV 21-854, 2021 WL 736376, at *1 (E.D. Pa. Feb. 25, 2021) (citing to *Buck,* and taking judicial notice of matters in underlying state court docket).

Rule 12(b)(1) permits a party to move for dismissal of any claim over which the district court lacks subject matter jurisdiction, and the plaintiff has "the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.,* 462 F.3d 294, 302 n.3 (3d Cir. 2006). Mootness is a proper basis for a 12(b)(1) motion[3] to

---

[3] Notably, in assessing a Rule 12(b)(1) motion, the Court may consider the same

dismiss because the mootness doctrine implicates jurisdictional matters. *See Mollett*

*v. Leicth,* 511 F. App'x 172, 173 (3d Cir. 2013) (noting that when a claim is moot,

"a federal court lacks jurisdiction to hear it"(citation omitted)).

### B.   PLAINTIFFS CANNOT ALLEGE A PLAUSIBLE BREACH OF CONTRACT CLAIM AS TO THE PCI AGREEMENT

Plaintiffs' fail to plead a plausible breach of contract claim with respect to the

PCI Agreement (Count I) because; (1) the PCI Agreement was replaced by the

Greenstar Agreement, thereby extinguishing all related contractual obligations, and

(2) even if valid, JLL's alleged failure to market PCI's software and services does

not violate any provision of the PCI Agreement, and, in fact, Plaintiffs have not

pointed to any provision of the PCI agreement that they claim JLL's alleged conduct

breached.

### 1.   The Greenstar Agreement was a Novation that Extinguished the PCI Agreement and all the Parties' Related Obligations

Under Illinois law[4], "a novation occurs when a valid new contract or

obligation is created and a valid existing contract or obligation is extinguished."

---

material beyond the pleadings that it may assess in ruling upon a Rule 12(b)(6)
motion. *See Gould Elecs. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir. 2000)
(explaining that when assessing a facial challenge to the court's subject matter
jurisdiction, the court considers only "the allegations of the complaint and
documents referenced therein and attached thereto," and in assessing a factual
challenge *"*the court may consider evidence outside the pleadings.").

[4] In their Complaint, Plaintiffs allege that Illinois law governs both the PCI

*United States Fid. & Guar. Co. v. Klein Corp.,* 558 N.E.2d 1047, 1051 (Ill. App. Ct. 1st Dist. 1989). *See also Cincinnati Ins. Co. v. Leighton,* 403 F.3d 879, 889 (7th Cir. 2005). The four elements of a novation, are: "[1] a previous, valid obligation; [2] a subsequent agreement of all the parties to the new contract; [3] the extinguishment of the old contract; and [4] the validity of the new contract." *Leighton,* 403 F.3d at 887 (quoting *Phillips & Arnold, Inc. v. Frederick J. Borgsmiller, Inc.,* 462 N.E.2d 924, 928 (Ill. App. Ct. 1st Dist. 1984)). When a novation occurs, it "discharges preexisting liability" under the previous agreement. *Id.* at 889-90 (citing *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 148 (3d Cir.1999) ("A novation bars revival of the preexisting duty."); *In re Newport Plaza Assoc., L.P.,* 985 F.2d 640, 644 (1st Cir.1993) (stating as a general proposition that a novation discharges all the rights and obligations under the previous agreement)).

Here, Plaintiffs' entire Complaint is premised on the alleged validity of the PCI Agreement and the subsequent Greenstar Agreement, thereby establishing the first and fourth elements of a novation. The second and third elements of a novation

---

Agreement and the Greenstar Agreement, and both agreements contain "Governing Law" provisions which state that the agreements "shall be governed and interpreted pursuant to the laws of the State of Illinois." (*See* Compl. ¶¶ 59, 74); O'Reilly Decl. Ex. A, § 26.6, Ex. B. § 23.6. When a contract specifies a choice of law, the court honors that choice so long as doing so would not violate public policy. *Curtiss-Wright Corp. v. Rodney Hunt Co.,* 1 F. Supp. 3d 277, 284 (D.N.J. 2014) (citing *Instructional Sys., Inc. v. Comput. Curriculum Corp.,* 614 A.2d 124, 133 (N.J. 1992)).

are established by the plain language of the PCI and Greenstar Agreements and

supported by Plaintiffs' allegations. The PCI Agreement, entered into on October

31, 2011 states in relevant part that:

> PCI is the owner and developer of that certain Managed
> Energy Savings Application Software ("Software") and
> Pacific Controls Galaxy Enterprise Platform ("Platform")
> which integrate with building automated systems to
> deliver optimization and governance centric data and has
> offered to provide the Software, Platform and the Services
> (as defined below) to JLL and its clients for those
> installation sites identified by JLL ("Installation Site(s)");
> and WHEREAS, JLL desires to secure the Software,
> Platform and the Services by PCI for the Installation
> Site(s).

O'Reilly Decl., Ex. A.

The 2016 Greenstar Agreement acknowledges the existence of the prior PCI

Agreement, states clearly that Greenstar is the "successor entity" to PCI, and that

Greenstar owns and will provide to JLL the same "Software" and "Platform"

previously provided by PCI:

> Greenstar Technologies LLC is the **successor entity** to
> Pacific Controls Inc. ("PCI"), **with whom JLL had a
> prior agreement for related services dated October 31,
> 2011.** WHEREAS, Greenstar Technologies LLC is the
> owner of the Managed Energy Savings Application
> Software ("Software") and Pacific Controls Galaxy
> Platform ("Platform") which integrate with building
> automation systems to deliver optimization and
> governance centric data and has offered to provide the
> Software and Platform (as defined below) to JLL and its
> clients for those installation sites identified by JLL
> ("Installation Site(s)") and together currently identified as

> JLL's IntelliCommand service product "IntelliCommand
> – Powered by Pacific Controls" ("IntelliCommand").
> WHEREAS, JLL desires to secure the Software and
> Platform from Greenstar Technologies LLC for the
> Installation Site(s). . . .

O'Reilly Decl., Ex. B. Therefore, the plain language of the agreements establishes

that the same relevant entities are parties to the subsequent Greenstar Agreement,

fulfilling the third element of novation.

This conclusion is fortified by the clear and unambiguous "Entire Agreement"

provision in the Greenstar Agreement that states explicitly that the Greenstar

Agreement supersedes the 2011 PCI Agreement, establishing the fourth element of

novation:

> This Agreement constitutes the entire agreement between
> Greenstar Technologies LLC and JLL with respect to
> IntelliCommand and **supersedes all prior negotiations**,
> **communications, representations or agreements**,
> whether oral or written, except to the extent they are
> expressly incorporate [sic] herein, **including any prior**
> **agreements with any predecessors or affiliates of**
> **Greenstar Technologies LLC including Pacific Control**
> **Systems, LLC.**

O'Reilly Decl., Ex. B, § 23.7.

Because the plain language of the agreements demonstrate on their face that

the Greenstar Agreement replaced and extinguished the PCI Agreement, a novation

occurred, barring any and all claims related to the PCI Agreement.[5] Therefore, Count I must be dismissed.

### 2. JLL's Purported Failure to Market PCI's Technology is not a Violation of Any Provision of the PCI Agreement

Plaintiffs' claim based on an alleged breach of the PCI Agreement fails for the additional reason that Plaintiffs do not cite to a single provision in the PCI Agreement that would have obligated JLL to market PCI's technology. Thus, JLL's purported failure to do so cannot amount to a breach. Tellingly, Plaintiffs fail to actually cite to any contractual provision in the PCI Agreement that they claim was breached by JLL's alleged conduct.

To state a claim for breach of contract under Illinois law, a party must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank,* 592 F.3d 759, 764 (7th Cir.2010)(quoting W.W. Vincent & Co. v. First Colony Life Ins. Co., 814 N.E.2d 960, 967 (Ill.2004)). It is tantamount to a properly pled breach of contract claim to identify a contractual provision the defendant breached. As the Northern District of Illinois Recognized:

---

[5] That a novation occurred extinguishing the PCI Agreement also serves as an additional independent basis for dismissing Counts II, III, and IV the breach of the covenant of good faith and fair dealing, bad faith, and accounting claims related to the PCI Agreement, addressed below in Points D and E.

> The Court fails to see how, post-*Iqbal*, a plaintiff could state a claim for breach of contract without alleging which provision of the contract was breached. Without alleging a contract provision that was breached, the claim is merely possible, not plausible.

*Burke v. 401 N. Wabash Venture,* LLC, No. 08-CV-5330, 2010 WL 2330334, at *2 (N.D. Ill. June 9, 2010) (internal citation omitted)).

Plaintiffs' breach of contract claim as to the PCI Agreement suffers from this fatal flaw. Plaintiffs allege that JLL breached the PCI Agreement by "not marketing IntelliCommand as agreed and not treating PCI fairly as agreed." (Compl. ¶ 60). They allege "JLL **had indicated to PCI that it intended** to market PCI's products/services throughout the world" and that the PCI Agreement **contemplated** that JLL would aggressively market PCI's services to its customers." (*Id.* at ¶¶ 6-7). But whatever JLL may have "indicated" or the parties "contemplated" there is not a single provision in the PCI Agreement that obligates JLL to take any particular action to market PCI's services. *See* O'Reilly Decl., Ex. A.

Rather, the PCI Agreement is akin to a vendor agreement for the procurement of goods and services. It states that PCI "has offered to provide the Software, Platform and the Services [] to JLL and its clients for those installation sites identified by JLL." *Id.* It explains that "[t]he parties agree that PCI will provide the Services to JLL clients or others at the Installation Site(s) as set forth in a Work Order," and that "[u]pon notice by JLL that a JLL client will be utilizing the Services,

PCI shall establish a separate account for each JLL client for billing and invoice purposes." *Id.* at § 2.3. There is absolutely no affirmative obligation or representation obligating JLL to market PCI's goods and services to any or all of its clients. The only section of the agreement that makes any reference to marketing is the "Branding" provision, which simply gives JLL the permission to market PCI goods and services to its clients: "JLL ***may*** offer and market the Services to its clients and others as 'IntelliCommand powered by PCI." *Id.* at § 25 (emphasis added).

Finally, the PCI Agreement contains an "Entire Agreement" provision, which makes clear that it represents the entire agreement between PCI and JLL. The Entire Agreement provision clearly and unequivocally state that the written agreement "supersedes all prior negotiations, communications, ***representations*** or agreements whether oral or written," and further states "no changes, alterations or modifications to this Agreement shall be effective unless in writing and signed by the respective parties hereto." *Id.* at § 26.7 (emphasis added). Thus, PCI's subjective interpretations or understandings of JLL's obligations vis-à-vis the marketing of its software and services, which are not set forth in the written agreement, cannot serve as a basis to bring a breach of contract claim against JLL.

In the absence of any contractual requirement for JLL to market PCI's products and services, Plaintiffs allege PCI relied to its detriment upon forecasts as to potential market growth contained in a business plan that *PCI prepared,* and

complain that JLL said nothing about whether those forecasts were reasonable. (*See* Compl. ¶¶ 12-13). Plaintiffs claim that PCI suffered substantial losses when the market potential for PCI's software and services did not live up to what *PCI had forecasted*. (*Id.* at ¶¶ 14-15) (emphasis added). Even accepting all these allegations as true (and they simply are not), they do not amount to a breach of the PCI Agreement, because they do not relate to any actual representations or obligations of JLL memorialized in that Agreement, and the Entire Agreement provision precludes PCI from relying upon any purported representations JLL allegedly made that are not included therein.

Similarly, based upon JLL's alleged failure to market PCI's software and services, Plaintiffs also assert that JLL breached the agreement by failing to treat PCI fairly. Plaintiffs allege that in the agreement, "JLL represented that it would maintain a relationship with PCI based upon fair and honest dealings at all times." (Compl. ¶ 9). The only provision in the PCI Agreement that relates to fair and honest dealings is the "Vendor Code of Conduct" provision, which ***imposes a duty on PCI*** to read and comport itself with JLL's Vendor Code of Conduct in all dealings with JLL and related subcontractors and third parties. O'Reilly Decl., Ex. A, § 21. Accepting for the purposes of argument that the Vendor Code of Conduct provision also implicitly obligates JLL to treat PCI fairly and honestly (as does, for example, the covenant of good faith and fair dealing that is implied in each contract), the ***only***

allegation Plaintiffs make to support their claim that PCI was treated unfairly by JLL is that JLL failed to market PCI's software and services as it represented it would, something JLL had absolutely no obligation to do under the PCI Agreement. (*See* Compl. ¶¶ 6-15).

Because the PCI Agreement did not impose any obligation upon JLL to market PCI's software or services, and because Plaintiffs have not and cannot cite to a single provision of the PCI Agreement that JLL purportedly violated, Plaintiffs' breach of contract claim with respect to the PCI Agreement fails on its face and must be dismissed. *See Ronald McDonald House Charities of Chicagoland v. Winning Charities Illinois*, *LLC,* No. 13-CV-1430, 2013 WL 5907668, at *4-6 (N.D. Ill. Nov. 4, 2013) (rejecting express breach of contract claim for failure to cite to contractual provision breached and further rejecting breach of contract premised upon a purported breach of the covenant of good faith and fair dealing because plaintiff failed to point to any contractual provisions that were allegedly breached as a result of the purported unfair conduct.)

Therefore, either as the result of a novation, or through Plaintiffs failure to allege a plausible claim, Count I must be dismissed.

### C. PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE BREACH OF CONTRACT CLAIM WITH RESPECT TO THE GREENSTAR AGREEMENT

As set forth above, to state a claim for breach of contract under Illinois law, a plaintiff must allege (1) the existence of a contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resulting damages. *Reger Dev., LLC,* 592 F.3d at 764. "As the party seeking to recover, the plaintiff bears the burden of proving that he or she sustained damages resulting from the breach." *Ollivier v. Alden*, 634 N.E.2d 418, 422–23 (Ill. App. Ct. 2d Dist. 1994). Therefore, under Illinois law, "[m]erely showing that a contract has been breached without demonstrating actual damage does not suffice to state a claim for breach of contract." *Allied Waste Transportation, Inc. v. John Sexton Sand & Gravel Corp.,* No. 13 C 1029, 2016 WL 3443897, at *20 (N.D. Ill. June 23, 2016)(citing *Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.,* 255 F.3d 397, 401 (7th Cir. 2001)).

Here, Plaintiffs' breach of contract claim as to the Greenstar Agreement fails on its face, because the Complaint lacks any allegations as to what purported damages JLL caused Greenstar due to its alleged breaches. Rather, throughout the Complaint, Plaintiffs reiterate that *PCI* suffered substantial losses due to JLL's purported failure to market PCI's software, platform, and services as agreed. (*See e.g.,* Compl. ¶ 40). But with respect to *Greenstar,* Plaintiffs allege JLL breached the agreement by, for example, not holding certain quarterly meetings and submitting

19

certain reports and budgets to Greenstar at the times set forth in the Greenstar Agreement. (*See* Compl. ¶¶ 25-31, 75). The Complaint is utterly silent as to how these purported breaches of the Greenstar Agreement caused any damage to Greenstar.

Instead, the Complaint contains numerous allegations citing to statements in JLL's literature and the 10-K filing of JLL's parent company, Jones Lang LaSalle Incorporated, about the importance of technology to JLL's business and its intention to establish a technology company. (Compl. ¶¶ 45-52). Plaintiffs then draw the unsupported conclusion that JLL's emphasis on technology (which, consequently involves a wide array of other technologies and services entirely unrelated to that which PCI/Greenstar provided) demonstrates that JLL planned a course of conduct, that played out *over 9 years,* to gain exclusive control over the PCI/Greenstar technology and "steal" it first from PCI and the from Greenstar. (Compl. ¶ 53). Not only is this allegation completely meritless, but it is entirely conclusory and unsupported by any actual factual allegations that would satisfy the *Iqbal* pleading requirements. *Iqbal*, 556 U.S. at 679. Nonetheless, even accepting Plaintiffs' bald accusation as true, it does not amount to an allegation that JLL breached any provision in the Greenstar Agreement resulting in harm to Greenstar.

Finally, Plaintiffs appear to allege that JLL breached the Termination provision of the Greenstar Agreement by informing Greenstar that IntelliCommand

was losing money and offering Greenstar a walk away by seeking "to buy out Greenstar's 35% free of cost." (*See* Compl. ¶¶ 45, 76, 91). JLL's offer of a walk away, however, is expressly permitted by the Greenstar Agreement, and Plaintiffs admit as much in their Complaint. The Greenstar Agreement states "[i]f, at any time, either party desires to terminate the agreement, it may offer a proposal, including potential consideration, to do so." O'Reilly Decl., Ex. B, § 10. (*See also,* Compl. ¶ 92). Because IntelliCommand was losing money, JLL proposed that Greenstar walk away from the Greenstar Agreement so as to not be in the hook for 35% of those losses if the relationship continued. *See* O'Reilly Decl., Ex. B, § 1.1. That Greenstar was unhappy with this proposal does not amount to a breach of contract.

In the alternative, the Greenstar Agreement also provides that "[i]n the case of termination, the 'fair value' of IMT will be through a fair valuation of IntelliCommand by an independent entity[,] . . . mutually agreed upon by JLL and Greenstar," and that Greenstar "shall be entitled to a one-time payment of 35% of the valuation." O'Reilly Decl., Ex. B, § 10; (Compl. ¶ 91). As Plaintiffs' allege, on April 28, 2020, JLL notified Greenstar of its intention to terminate the agreement as of August 31, 2020 and, to date, the valuation procedure outlined in the Agreement has not occurred. (Compl. ¶¶ 90-92). The Agreement, however, is *silent* as to when the parties need to undertake the valuation and how it should be initiated and, as of the filing of the Complaint and this Motion, the Greenstar Agreement remains in

effect. *See* O'Reilly Decl., Ex. B, § 10. As a result, the mere fact that the valuation contemplated by the agreement has not yet occurred does not amount to a breach of any contractual provision.

Therefore, while the Complaint contains a whole host of conclusory allegations about JLL's purported efforts to try and steal the PCI/Greenstar technology to build its own technology company, it fails to state a plausible claim that JLL's purported action or inaction breached any of the provisions of the Greenstar Agreement resulting in actual damages to Greenstar. Therefore, Count V must be dismissed for failure to state a claim upon which relief may be granted.

### D.   PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM FOR AN ACCOUNTING UNDER EITHER CONTRACT

Counts IV and VIII fail to state plausible claims for relief because Plaintiffs have not alleged facts to demonstrate they are entitled to an equitable accounting with respect to either the PCI Agreement (Count IV) or the Greenstar Agreement (Count VIII). As to the PCI Agreement, Plaintiffs seek an accounting because they allege "it is unclear if all work orders involving IntelliCommand in some fashion were reported to and/or provided to PCI while the PCI Agreement was in effect." (Compl. ¶ 70). As to the Greenstar Agreement Plaintiffs allege an accounting is necessary because "it is unclear if JLL properly reported all revenue from sales

involving IntelliCommand." (*Id.* at ¶ 86). Such allegations are woefully insufficient to support a claim for an equitable accounting under Illinois law.

"To state a claim for the equitable relief of an accounting, a plaintiff must allege the absence of an adequate remedy at law." *Mann v. Kemper Fin. Cos.,* 618 N.E.2d 317, 327 (Ill. App. Ct. 1st Dist. 1992); *see also Zell v. Jacoby–Bender, Inc.,* 542 F.2d 34, 36 (7th Cir. 1976) (finding that the necessary prerequisite to maintain a suit for an equitable accounting, like all other equitable remedies, is the absence of an adequate remedy at law). In addition to the absence of an adequate remedy at law, the plaintiff must allege at least one of the following: "(1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." *Mann,* 618 N.E.2d at 327. Even when these prerequisites have been satisfied, a "district court has broad discretion in deciding whether an accounting is appropriate." *ABM Marking, Inc. v. Zanasi Fratelli*, *S.R.L.,* 353 F.3d 541, 545 (7th Cir. 2003).

Here, as an initial matter, the Complaint is devoid of any allegations that Plaintiffs are without an adequate remedy at law. *See Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems,* 428 F.3d 706, 715 (7th Cir. 2005) (affirming district court's refusal to permit equitable accounting claim where plaintiff "has not alleged that it is without an adequate remedy at law."). As the Seventh Circuit noted in *Kempner,* an equitable accounting is not necessary when

23

what the parties allege is "nothing more than a garden-variety contract dispute." *Id.*

*See also Melikhov v. Drab,* No. 16 C 9332, 2017 WL 3234808, at *7 (N.D. Ill. July

31, 2017)(explaining that "breach of contract remedies typically obviate the need for

an accounting."). Because Plaintiffs have not and cannot allege that there is no

adequate remedy available at law, both equitable accounting claims[6] must be

dismissed.

Even if Plaintiffs' had sufficiently alleged they have no adequate remedy at

law, which they have not, the equitable accounting claims would still fail because

they have not alleged: "(1) a breach of a fiduciary relationship, (2) a need for

discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex

nature." *Kempner,* 428 F.3d at 715 (citing *Mann,* 618 N.E.2d at 327). Where, as here,

the request for an accounting relates to a breach of contract, a plaintiff "must show

that there are mutual accounts between the parties or another complexity in

calculating damages that would justify an accounting." *Melikhov*, 2017 WL

3234808, at *7. Courts have defined such complex accounts as so "complicated as

to be beyond the comprehension of a trier of fact." *National Serv. Ass'n, Inc. v.

Capitol Bankers Life Ins. Co., Inc.,* 832 F. Supp. 227, 231 (N.D. Ill. 1993). A party

---

[6] As noted above in Point B.1, because the Greenstar Agreement was a novation
extinguishing the PCI Agreement, the PCI Agreement Accounting claim also fails
because all liability under the PCI Agreement was extinguished.

must show that "the 'accounts between the parties' are of such a 'complicated nature'
that only a court of equity can satisfactorily unravel them." *Kempner,* 428 F.3d at
715 (citing *Zell,* 542 F.2d at 36).

Plaintiffs' Complaint does not contain any allegations that would suggest that
the relationships between PCI and JLL and Greenstar and JLL involve accounts that
are so complex that only a court of equity could unravel them. While Plaintiffs allege
they do not know if all PCI work orders and IntelliCommand revenue were properly
reported to Plaintiffs, "[t]he need to examine [JLL's] business records is not a
sufficient justification for an equitable accounting." *Oil Exp. Nat'l, Inc. v. Latos,* 966
F. Supp. 650, 652 (N.D. Ill. 1997). Moreover, Plaintiffs' equitable accounting claims
are unnecessary and duplicative as the information requested could be revealed
through discovery on the breach of contract claims. *Melikhov*, 2017 WL 3234808,
at *7 (citing *Kempner*, 428 F.3d at 715).

Because Plaintiffs have not and cannot plead any facts that would support the
elements of an equitable accounting claim, Counts IV and VIII must be dismissed.
*See also Estate of Brown v. Arc Music Grp.,* 830 F. Supp. 2d 501, 509 (N.D. Ill.
2011)(dismissing plaintiff's accounting claim where plaintiff did not adequately
plead any of the elements and "it [was] clear that a breach of contract claim would
provide an adequate legal remedy.").

### E. COUNTS II, III, VI, VII, AND IX MUST BE SUMMARILY DISMISSED BECAUSE THEY SEEK TO RAISE CAUSES OF ACTION THAT ARE NOT RECOGNIZED BY ILLINOIS LAW

Finally, Plaintiffs' Complaint contains breach of the implied covenant of good faith and fair dealing, bad faith tort, and specific performance claims that are not cognizable under Illinois law and, therefore, must be summarily dismissed. Plaintiff's specific performance claim must also be dismissed because it is now moot.

#### 1. The Breach of the Implied Covenant of Good Faith and Fair Dealing Claims Fail as a Matter of Law

Counts II and VI seek to raise claims for breach of the implied covenant of good faith and fair dealing with respect to the PCI Agreement (Count II) and the Greenstar Agreement (Count IV). (Compl. ¶¶ 64-66; 80-82). Under Illinois law, a duty of good faith and fair dealing is present in every contract. *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 381 (7th Cir. 2000). The obligation, however, "is used as an aid in construing a contract under Illinois law," and "does not create an independent cause of action." *McArdle v. Peoria Sch. Dist. No. 150,* 705 F.3d 751, 755 (7th Cir. 2013); *Voles v. Sandia Mortgage Corp.,* 751 N.E.2d 1126, 1131 (Ill. 2001) ("The covenant of good faith is a rule of contract construction, and does not create an "independent source of tort liability."). Therefore, Counts II and VI must be dismissed.

## 2.    The Bad Faith Tort Claims Fail as a Matter of Law

Similarly, Counts III and VII assert "bad faith" tort claims arising "from the same duties" that are imposed by the PCI Agreement (Count III) and the Greenstar Agreement (Count VII). (Compl. ¶ 68, 84). But "the tort of bad faith is not a separate and independent tort action that is recognized in Illinois."[7] *Cramer v. Ins. Exchange Agency,* 675 N.E.2d 897, 900 (Ill. 1996). "To allow a bad-faith action would transform many breach of contract actions into independent tort actions." *Id.* at 904. Moreover, even if Illinois law permitted a "bad faith" tort claim, Plaintiffs claims must be dismissed because "Illinois law bars recovery of purely economic losses in tort." *Vacuum Indus. Pollution, Inc. v. Union Oil Co. of California,* 764 F. Supp. 507, 512–13 (N.D. Ill. 1991), *aff'd,* 958 F.2d 375 (7th Cir. 1992) (citing *Moorman Manufacturing Co. v. National Tank Co.,* 435 N.E.2d 443 (1982)).

In Counts III and VII Plaintiffs seek purely economic recovery related to JLL's purported bad faith conduct with respect to the parties' contractual agreements. (*See* Comp. ¶¶ 68, 84). It is well settled that "[b]ecause contract law is uniquely suited to their recovery, economic losses alone, 'without any claim of

---

[7] The Illinois Insurance Code provides a statutory remedy when an insurer's actions with respect to a claim made under a policy are "vexatious and unreasonable," which, "essentially substitutes for a separate tort of 'bad faith'" in the insurance context, but such remedy clearly is not applicable here. *See W. Howard Corp. v. Indian Harbor Ins. Co.,* No. 1:10-CV-7857, 2011 WL 2582353, at *3 (N.D. Ill. June 29, 2011).

personal injury or damage to other property,' cannot be recovered in a tort action."

*Id.* at 513 (quoting *M Ganton Technologies, Inc. v. Quadion Corp.,* 755 F. Supp.

203, 208 (N.D. Ill. 1990)). Therefore, Counts III and VII must be dismissed.

### 3.    The Specific Performance Claim Fails as a Matter of Law and is Moot

Count IX asserts a claim for specific performance of the Termination

provision of the Greenstar Agreement. (Compl. ¶¶ 90-94). As an initial matter,

"specific performance is not an independent cause of action." *Lagen v. United Cont'l*

*Holdings, Inc.,* 920 F. Supp. 2d 912, 918–19 (N.D. Ill. 2013). Rather, it is an

equitable remedy for breach of contract. *Id.* Therefore, while Plaintiffs may seek

specific performance to remedy any purported breach of the Greenstar Agreement,

it is not a stand-alone cause of action and must be dismissed.

Further, Count IX seeks specific performance of the Termination provision of

the Greenstar Agreement and specifically the "valuation of IntelliCommand by an

Independent Entity." (Compl. ¶¶ 91-92); O'Reilly Decl., Ex. B, § 10.  Pursuant to

Rule 12(b)(1), Count IX must be dismissed for lack of subject matter jurisdiction

because the valuation contemplated by the Termination provision has now occurred

and thus Count IX is moot. (*See* ECF 10-27). A plaintiff's claim is rendered moot

when "the issues presented are no longer live." *United Steel Paper & Forestry*

*Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of*

*the Virgin Islands*, 842 F.3d 201, 208 (3d Cir. 2016) (quoting *County of L.A. v.*

*Davis,* 440 U.S. 625, 631 (1979)). The publicly available docket in this matter demonstrates that the Court stayed the case for over two years while the valuation process took place. (ECF 10-31). Thus, in addition to not being legally cognizable, Count IX must also be dismissed pursuant to Rule 12(b)(1) as moot.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that its Motion to Dismiss Plaintiffs' Complaint be granted, in its entirety, and that Plaintiffs' Complaint be dismissed.

Dated: February 3, 2023

By:    s/*Liza M. Walsh*
                         _____
                         Liza M. Walsh
                         Tricia B. O'Reilly
                         Mariel L. Belanger
                         WALSH PIZZI O'REILLY FALANGA LLP
                         Three Gateway Center
                         100 Mulberry Street, 15th Floor
                         Newark, NJ 07102
                         Tel: (973) 757-1100

                         *Attorneys for Defendant*
                         *Jones Lang LaSalle Americas, Inc.*