### UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GREENSTAR TECHNOLOGIES LLC AND PACIFIC CONTROLS, INC., | Civil Action No. 3:20-cv-07900 (GC-TJB) |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| JONES LANG LASALLE AMERICAS, INC., | |
| Defendant. | |

Plaintiffs, Greenstar Technologies LLC and Pacific Controls, Inc., which are both located at 230 Davidson Avenue, Somerset, New Jersey, by means of Complaint as against defendant Jones Lang LaSalle Americas, Inc., allege and say:

### <u>JURISDICTION</u>

1.      Plaintiff, Greenstar Technologies LLC ("Greenstar"), is a New Jersey limited liability company with its principal place of business located at 230 Davidson Avenue, Somerset, New Jersey.  Its members are Beena Abraham, a resident of the State of New Jersey, and Chris Nazareth, a resident of the State of New York.

2.      Plaintiff, Pacific Controls, Inc. ("PCI"), is a New Jersey corporation with its principal place of business also situated at 230 Davidson Avenue, Somerset, New Jersey.

3.      Defendant, Jones Lang LaSalle Americas, Inc. (hereinafter "JLL" or "Defendant"), is, upon information and belief, a Maryland corporation with its principal place of business in Illinois.

4.      The amount in controversy is far in excess of seventy-five thousand dollars ($75,000.00) exclusive of interest and legal fees.  It is anticipated that the compensatory damages will involve tens of millions of dollars.

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C.

§1332 a.

6.     This is the proper venue for this action pursuant to 28 U.S.C. §1391 since the

Plaintiffs are located here and many of the actions underlying the dispute occurred here. Further,

this case was filed in state court in New Jersey and removed to this Court by the defendant.

## BACKGROUND FACTS AS TO ALL COUNTS

7.     Both Greenstar and PCI are and during all relevant times were engaged in the

business of providing cloud technology services and materials to customers, including a platform,

software and related services.

8.     In or about 2011, PCI responded to JLL's request for proposals and had discussions

with representatives of JLL about JLL entering into an agreement with PCI as to use of PCI's

products and/or services.  PCI was selected by JLL over other responses to the international request

for proposals and the  discussions resulted in PCI and JLL entering into an Agreement For Services

on or about October 31, 2011 (hereinafter "PCI Agreement").

9.     At the time that PCI and JLL executed the PCI Agreement, JLL was managing

many buildings with a total square footage of more than two billion (2,000,000,000) square feet.

The potential revenue related to PCI's services arising out of JLL's relationships with the many

tenants and its management of so much square footage was the primary reason for PCI to enter

into said PCI Agreement.  In that regard, JLL had indicated to PCI that it intended to market PCI's

products/services throughout the world.

10.     The PCI Agreement contemplated that JLL would aggressively market PCI's

services to its customers.   For example, it indicates that PCI was offering to provide its software,

platform and services to JLL and its clients.  It indicates that JLL desires the software, platform

and services.  As per Exhibit C thereto, which was expressly incorporated by reference, it was anticipated that PCI's software, platform and services would be marketed by JLL to clients in the following industries: Data Centers; General Offices; Hotels; Manufacturing; Retail; Hospitals; Warehouse and Labs.  The same exhibit also contemplates that the JLL client spaces would range from 1000 square feet to 10,000,000 square feet and discounts would be provided based upon volumes of buildings ranging from a minimum of 100 buildings to a maximum of "Above 500 buildings.".

11.    Pursuant to the PCI Agreement, the starting point for PCI to provide its software, platform and/or services to  "JLL clients or others at the Installation Site(s)" was for JLL to provide notice to PCI of a work order issued in accordance with the PCI Agreement.  Thus, JLL controlled the marketing of PCI's software, platform and/or services and represented that it would be marketing same to clients in the industries identified above, with square footages identified above and/or volumes of buildings identified above. PCI relied upon those provisions as well as the other provisions to which reference is made in this pleading as consideration for the significant efforts that PCI had undertaken and was continuing to undertake so that it would fulfill its obligations under the PCI Agreement, which it did.  JLL breached the PCI Agreement by failing to market PCI's Platform, Software and/or services in the manner contemplated by the PCI Agreement.

12.    In Section 6 of the PCI Agreement, it provided that "During the term of this Agreement, PCI shall provide to JLL and its clients the training, support and maintenance services set forth in Schedule 2."  There was no limitation upon which JLL clients same would be available for.

13.    Pursuant to the PCI Agreement, JLL represented that "The relationships with our suppliers are based on the principle of fair and honest dealings at all times and in all ways."

(Section 21). PCI relied upon that provision especially here because JLL had control over so much of the agreed upon performance, including but not limited to the issuance of work orders and the manner in which it marketed.

14.    The PCI Agreement also provided that there would be satisfaction surveys issued to JLL clients.  There was no limitation placed upon which JLL clients the surveys would be issued to.

15.    The PCI Agreement expressly and/or impliedly stated that JLL would be marketing PCI's Platform and Software to all of its clients.  In the alternative, it expressly and/or impliedly stated that JLL would be marketing it to its clients in the above referenced industries with the size spaces being managed by JLL set forth on Exhibit C.

16.    Consistent with the parties' intentions as reflected in the PCI Agreement, in or about September, 2012, PCI provided JLL with a Business Plan (the "Business Plan").  JLL never indicated that said Business Plan was unrealistic, unreasonable and/or that it did not intend to act consistent therewith.

17.    If a reasonable person disagreed with said Business Plan and/or considered it unreasonable and/or unrealistic, he/she would have expressed his/her views when or shortly after PCI presented said Business Plan.  The failure of any representatives of JLL to express such sentiments meant that it impliedly agreed therewith.

18.    Said Business Plan identifies actions and efforts which were anticipated by PCI based upon input and representations from defendant JLL.  The Business Plan states:

> JLL is a financial and professional services firm specializing in real estate. JLL offers integrated services to clients seeking increased value by owning, occupying or investing in real estate. JLL is an industry leader in property and corporate facilities management services, with a portfolio of approximately 2.1 billion square feet worldwide. . . .

> The partnership agreement signed in October 2011 has tenure of
> ten years. PCI and JLL envision huge growth potential for the
> distinctive technology backed service. The company is currently
> having a strong pipeline of close to 60 potential customers from
> various industry groups, most of which are expected to be signed
> within the next six to twelve months.  As of now, the combined
> value of the proposals amount to approx. USD 1.5 million, with
> an average annual monitoring fee per customer of approx. USD
> 26,000.   PCI forecast its revenue to grow at a CAGR
> (Compounded Annual Growth Rate) of 122.8% during the
> next five years to touch USD 143.6 million in 2017.

19.     Consistent therewith and/or the PCI Agreement, PCI expended substantial sums, energy and resources making certain that it was in a position to fully comply with its obligations pursuant to the PCI Agreement.  PCI did fully comply with its contractual obligations.

20.     JLL's representations to PCI as to the market potential for PCI's software, platform and/or Services, made both before and after the PCI Agreement was executed, were either grossly negligent, intentionally false or JLL failed to market same to its customers as represented and contemplated in the PCI Agreement.

21.     PCI was unaware that JLL had intentionally not marketed its Platform and/or Software as per the PCI Agreement and/or business plan when it transferred the Software and/or Platform to Greenstar Technologies LLC ("Greenstar") for Greenstar to enter into an agreement with JLL.

22.     In addition, unbeknownst to PCI at the time, JLL planned on and/or had started integration of PCI's Platform with other technology offerings of JLL.  JLL intentionally withheld same from PCI.  That means that JLL was able to avoid the work order process by using the Platform for other offerings.

23.     As a result of such actions and/or such representations by JLL, PCI did not realize what it had projected in the Business Plan quoted above and, in fact, its revenues were a small

fraction of what had been projected and/or contemplated by the express terms of the PCI Agreement.  The revenues were also far less than they would have been if JLL had not breached the PCI Agreement.

24.     JLL's misrepresentations and/or breaches caused PCI to incur substantial losses and/or realize far less revenue than it would have realized if JLL had not breached the PCI Agreement.

25.     Ultimately, PCI indicated that it could no longer afford to maintain its efforts with respect to the software, platform and services. That was as a result of JLL's breaches. It then proposed that JLL consider entering into an agreement with respect thereto with a company named Greenstar..

26.     JLL agreed to enter into an agreement with Greenstar.  The purposes of the new agreement included the increasing of marketing efforts to both existing JLL clients and external prospects, integrating IntelliCommand into JLL's "Smart Building Strategy" and ultimately making IntelliCommand the premier optimization system in the commercial real estate industry.

27.     As a result of the foregoing, on or about September 1, 2016, Greenstar entered into an Interim Teaming Agreement ("Greenstar Agreement") with JLL.

28.     Pursuant to the Greenstar Agreement,, Section 1, JLL was to establish an "IntelliCommand Management Team ("IMT") comprised of JLL employees to oversee and control all business operations for IntelliCommand, including personnel management, marketing, sales, accounting, finance and all related hardware and software (including the Software and Platform) necessary to deliver IntelliCommand to clients at the Installation Sites."

29.     The Greenstar Agreement, Section 1.3, also provides that "JLL and Greenstar Technologies LLC will form an Advisory Committee to guide IMT with strategy and direction."

30.     The Greenstar Agreement, Section 1.1, provides that the IMT has various obligations, including but not limited to:  reporting to Greenstar on a monthly basis the "net proceeds" and providing to the Advisory Committee, which included one or more representatives of Greenstar, the "annual operating budget and capital budget for IntelliCommand" for "review and approval."

31.     The Greenstar Agreement, Section 1.5, also provided that the IMT shall "bear all of the costs associated with the maintenance of the Source Code Escrow."

32.      JLL is and was, during all relevant times. a large company with revenues in the billions of dollars each year during which its agreement first with PCI and then with Greenstar were in effect.  Both PCI and Greenstar were and are relatively small companies so JLL's resources far exceed those of PCI and Greenstar combined.

33.     JLL also represented to both entities, as expressly stated in both the PCI Agreement (Section 21) and the Greenstar Agreement (Section 11), that its Code of Conduct required it to treat them fairly at all times and in all ways.  That representation was especially important to both PCI and Greenstar in light of the huge disparity in resources as between them and JLL.

34.     Notwithstanding said representations, JLL failed to treat either PCI or Greenstar fairly and apparently decided that its size would allow it to treat the much smaller companies unfairly and that it could do so with impunity.

35.     Consistent therewith, JLL has repeatedly and materially breached the Greenstar Agreement in that the IMT, which is comprised solely of JLL employees, has failed to notify Greenstar on a monthly basis of the net proceeds as to IntelliCommand.  Greenstar currently believes that the IMT has not accounted for very substantial revenues derived from the integration of its Platform with other technology offerings of JLL.

36.     Consistent with its view that it could breach the Greenstar Agreement with impunity due to the gross disparity in size, JLL has also breached the Greenstar Agreement (Section 1.3) in that it failed to schedule at least quarterly meetings of the Advisory Committee.

37.     Consistent therewith, JLL breached the Greenstar Agreement (Section 1.4) by failing to submit a Personnel Plan at least to the Greenstar member(s) of the Advisory Committee.

38.     Consistent therewith, JLL breached the Greenstar Agreement (Section 1.5) by failing to assume responsibility for paying the ongoing fees with respect to the licenses and agreements related to the Software and the Platform.

39.     Consistent therewith, the IMT, again comprised solely of JLL employees, breached the Greenstar Agreement (Section 1.7) in that no annual operating budget was submitted to the Greenstar member(s) of the Advisory Committee for review and approval.

40.     Consistent therewith, JLL breached the Greenstar Agreement (Section 13) by failing to, after a relatively short period of time, use the agreed upon format of "IntelliCommand-Powered by Pacific Controls."  Rather, it deleted reference to IntelliCommand being "powered by Pacific Controls."

41.      In fact, JLL's bad faith and arrogance, including its breaches of the Code of Conduct provisions as to treating suppliers honestly and fairly, was so great that after 2017, it did not even advise Greenstar of the identities of the members of the IMT notwithstanding that Greenstar fully complied with its contractual obligations.

42.      JLL's actions clearly demonstrate that, as to PCI and/or Greenstar, it breached its own requirements that it treat its suppliers "based on the principle of fair and honest dealings at all times and in all ways."

43.   Since the relationship as between PCI and JLL involved JLL's marketing of PCI's services and products to JLL's customers, PCI had to especially rely upon JLL's good faith and/or fair and honest dealings.

44.   Since the relationship as between Greenstar and JLL involved JLL's marketing of Greenstar's services and products to JLL's customers, Greenstar had to especially rely upon JLL's good faith and/or fair and honest dealings.  That is also true because JLL, as part of entering into the Greenstar Agreement, insisted upon a 65% interest in the net proceeds while it assumed control over what had been PCI's employees and operation.  That this was likely planned by JLL from the start is clear from JLL's expression of interest in 2011 for equity in PCI.

45.   As reflected by the various breaches of the PCI Agreement as set forth above, JLL did not treat PCI fairly.

46.   As reflected by the various breaches of the PCI Agreement set forth above, JLL breached the implied covenant of good faith and fair dealing with respect to PCI.

47.   As reflected by the various breaches of the Greenstar Agreement as set forth above, JLL did not treat Greenstar fairly.

48.   As reflected by the various breaches of the Greenstar Agreement as set forth above, JLL breached the implied covenant of good faith and fair dealing with respect to Greenstar.

49.   Such conduct caused PCI substantial losses in terms of the significant sums it paid to continue to develop and or improve upon IntelliCommand and the substantial revenue it had projected, based upon input from JLL, which was never realized and/or the substantial revenue it would have received if JLL had complied with the PCI Agreement.  In fact, it was as a result of JLL's actions that PCI could not afford to continue to incur the costs associated with its responsibilities under the PCI Agreement which resulted in its arranging for Greenstar to enter into

an agreement with JLL and the need to provide JLL with a 65% interest in what had been PCI's operation of IntelliCommand.

50.     Given the provisions of the PCI Agreement, that JLL was an industry leader in real estate management and related matters, given the vast amount of real estate which it was managing, given its reported emphasis on technology such as that in connection with which PCI was involved and given the communications as between JLL and PCI, PCI was led to believe that JLL would market its products and services to virtually all of JLL's customers and that such efforts should result in far more work orders than occurred.

51.     That JLL had not marketed IntelliCommand to the extent contemplated was clear from the IMT meeting which occurred on December 2, 2016, which was the last such meeting of which Greenstar was advised.  At the December 2, 2016 IMT meeting, it was announced that "JLL leadership reaffirmed support for expansion of" IntelliCommand.   If JLL had been marketing IntelliCommand as contemplated in the PCI Agreement, there would have been no need for the JLL leadership to agree to expand IntelliCommand.

52.      In fact, JLL actually stated at that meeting that "now that IntelliCommand is in-house", there would be a "continued push for greater international adoption."  Again, if it was marketing IntelliCommand to all of the industries contemplated in the PCI Agreement and/or as contemplated therein, there would have been no need to push for greater international adoption.

53.     As a further indication of the inappropriate manner in which JLL treated Greenstar, JLL provided Greenstar with annual reports as to the revenues and costs for IntelliCommand in violation of the Greenstar Agreement.  Such reports would be provided whenever JLL decided to prepare them and provide same to Greenstar.

54.     JLL provided Greenstar with an annual report which was itself in violation of the Greenstar Agreement which required monthly reports as to revenues and costs associated with IntelliCommand. It indicated that the report was late because the preparer, an employee of JLL, wanted to make certain that the calculations were accurate.  Notwithstanding said representation, JLL thereafter claimed that the annual statement was inaccurate because it failed to include costs that should have been allocated to IntelliCommand and that, as a result, IntelliCommand was losing money.  That was in response to communications on behalf of Greenstar about exposure of JLL and was in an attempt to get Greenstar to agree to "walk away" from the Greenstar Agreement and IntelliCommand.  At the same time, JLL and/or its parent company was planning on making a large investment in its technology, of which IntelliCommand was an important part, and planned on establishing a separate technology company which would include IntelliCommand.

55.     The importance of IntelliCommand to JLL's technology plans is clear from literature of JLL which it circulated at an Engineering Services Conference held in May, 2018. JLL's literature on IntelliCommand was copyrighted by JLL.  That literature makes frequent references to IntelliCommand and never makes reference to IntelliCommand being powered by Pacific Controls.  However, it also explains that IntelliCommand (as developed by the Plaintiffs) is a sophisticated and relatively comprehensive system used for purpose of optimizing climate control, scheduling repairs and optimizing building system operations and equipment performance.  In fact, in the literature which JLL prepared in connection with said Engineering Services Conference, it indicated that IntelliCommand is a "Monitoring-based commissioning and building optimization platform."  It proceeded to represent that it "captures data from all building types and sizes" and  it has "advanced analytics" involving "advanced algorithms analyze data points from meters and sensors throughout buildings" which perform "automated monitoring and

optimization of building system operations and equipment performance" and also "integrates with work order system to alert staff of needed repair and tracks issue through closure."  That JLL literature further indicates that IntelliCommand improves "occupant satisfaction and productivity by enhancing the workplace environment with optimal working conditions" and it manages "energy usage and reduce energy and operational costs. . . ."  It also indicates that IntelliCommand can be integrated with numerous systems and analytical tools.

56.     In the Form 10-K filing by Jones Lang LaSalle Incorporated with the Securities and Exchange Commission for the fiscal year ending December 31, 2019 ("SEC Filing"), the corporation represented that technology was the "backbone" of its integrated facilities management.  According to the SEC Filing, JLL "is a leading professional services firm that specializes in real estate and investment management." It shapes "the future pf real estate for a better world by using the most advanced technology to create rewarding opportunities, amazing spaces and sustainable real estate solutions for our clients, our people and our communities."  The SEC Filing then indicates that "JLL is a Fortune 500 company with annual revenue of $18.0 billion, operations in over 80 countries and a global workforce of over 93,000 as of December 31, 2019."

57.     The SEC Filing addresses in detail the tremendous value of the technology involved with IntelliCommand to JLL's customers.  For example, it declares that:

> Data and technology have <u>become core to all clients'</u> workplace and business transformation agendas.  Ahead of this trend, we built a comprehensive data and technology platform that <u>underpins all of our offerings</u>, helping clients make fast, informed decisions that enhance the performance of their workplace, portfolios and people. Digital Solutions experts guide clients' selection, imple- mentation and management of real estate-related software and applications The Building Services Network opens new client segments by revolutionizing end-to-end facility repair and maintenance service delivery, using the <u>Corrigo</u> platform to find clients the best service providers.  [emphasis added]

58.     In the literature prepared in connection with the 2018 Engineering Services Conference, JLL indicated that "Integration is bi-directional.  Reactive work orders are created by

IntelliCommand directly into Corrigo; updates from the technician are passed back to IntelliCommand." [emphasis added] Therefore, Corrigo and IntelliCommand appear to be fully integrated.

59.     The SEC Filing further refers to the critical role of technology with respect to JLL's business.  In fact, it expressly states that "We regard our technology and other intellectual property, including our brands, as a critical part of our business."

60.     The SEC Filing also refers to JLL "becoming the widely-recognized leading user of technology and data in real estate" and that "By deploying flexible digital solutions, we are able to measure, manage and improve environmental impacts for the nearly 200,000 buildings included on these platforms."

61.     When analyzing both the JLL literature and the SEC Filing, it is clear that IntelliCommand is an important component of the "backbone" of JLL's integrated facilities management.

62.      The logical conclusion of the foregoing is that JLL planned a course of conduct for years so as to get the IntelliCommand platform, workers, materials, software, codes, etc. within its exclusive control and to "steal" it away from first PCI and then Greenstar.  Such efforts included first getting PCI to spend tens of millions of dollars to render the technology compatible with JLL's technology; to then not market it as agreed so that PCI would lose substantial sums on its significant investment; then to agree to take on the PCI personnel involved with it and enter into an agreement whereby it gained a 65% interest in IntelliCommand and the related platform; then to keep Greenstar "in the dark" as to what JLL was doing with the technology by not conducting Advisory Committee meetings, advising Greenstar who were the members of the IMT and/or providing monthly reports; then to advise Greenstar that notwithstanding the latest reports

13

IntelliCommand was losing money; then to offer to buy the remaining 35% interest for nothing while not advising Greenstar that JLL was investing a substantial sum into technology and/or that it was forming a new technology company.

63.     According to the SEC Filing, "Another key transformation was bringing together all of our internal and client -facing technology, data and AI operations into a globally-aligned group called JLL Technologies . . . We predict the creation of JLL Technologies will become apparent as a major growth driver for us over the medium term." JLL, by breaching the Greenstar Agreement and not holding the meetings agreed to, withheld that information from Greenstar.

64.     Then, to again take advantage of its small provider of extremely valuable products and technology, it first attempted to get Greenstar's 35% interest for free and when Greenstar refused, it declared the Greenstar Agreement terminated effective August 31, 2020.

65.      Said actions, individually and/or in combination, were malicious, wanton and/ or oppressive and clearly constitute bad faith.

66.     Said actions, individually and/or in combination, are clearly in breach of JLL's agreements to treat first PCI and then Greenstar fairly at all times and in all ways.

**FIRST COUNT**

67.     Plaintiff PCI repeats and re-alleges all of the allegations set forth in Paragraphs 1-66 hereof as if set forth herein in their entirety.

68.     Pursuant to the PCI Agreement, Illinois law applies. Illinois law provides a ten (10) year limitations period for breach of contract claims.

69.     As set forth above, JLL breached the PCI Agreement in multiple respects, including but not limited to not marketing IntelliCommand as agreed in the PCI Agreement and not treating PCI fairly as expressly agreed in the PCI Agreement.

14

70.     As set forth above, PCI was unaware of many of the breaches by JLL of the PCI Agreement when it participated in the transfer of the Platform and Software to Greenstar.

71.     PCI was damaged by JLL's breaches of the PCI Agreement.

72.     JLL is liable to PCI for breach of contract.

WHEREFORE, Plaintiff PCI requests judgement as against JLL for:

(A)      Compensatory damages;

(B)     Interest;

(C)     Counsel Fees;

(D)     Costs; and

(E)     Such other relief as the Court deems proper.

## SECOND COUNT

73.     Plaintiff, PCI, repeats and re-alleges the allegations contained in Paragraphs 1-72 hereof as if set forth herein in their entirety.

74.     JLL, by its actions detailed above, breached the implied and express covenants of good faith and fair dealing as contained in and as they relate to the PCI Agreement.

75.     Further, JLL also defrauded PCI by using PCI's Platform for other technology offerings without so advising PCI and/or by planning on so using PCI's Platform.  In so doing, JLL would be able to avoid creation of work orders and also avoid compensating PCI because PCI had no knowledge of what JLL was doing.

76.     PCI was damaged by JLL's breach of the express and/or implied covenant of good faith and fair dealing with respect to the PCI Agreement.

77.     PCI was damaged by JLL's fraud in that JLL started using the Platform without compensating PCI for same.

78.    JLL is liable to PCI for its breaches of the express and/or implied covenant of good faith and fair dealing related to the PCI Agreement.

79.    JLL is liable to PCI for fraud.

WHEREFORE, Plaintiff PCI requests judgement as against JLL for:

(A)    Compensatory damages;

(B)    Punitive damages;

(C)    Interest;

(D)    Counsel Fees;

(E)    Costs; and

(F)    Such other relief as the Court deems proper.

## **THIRD COUNT**

80.    Plaintiff, PCI, repeats and re-alleges all of the allegations contained in Paragraphs 1-79 of this First Amended Complaint as if set forth herein in their entirety.

81.    Illinois law recognizes that tortious conduct may arise from the same duties as are imposed by contract.  JLL's bad faith and/or fraudulent conduct toward PCI, as set forth in detail above and which was malicious, willful, wanton and/or oppressive, caused PCI to incur substantial losses and also renders it liable for bad faith and/or fraud in tort and for punitive damages.

WHEREFORE, Plaintiff PCI requests judgement as against JLL for:

(A)    Compensatory damages;

(B)    Punitive damages;

(C)    Interest;

(D)    Counsel Fees;

(E)    Costs; and

(F)     Such other relief as the Court deems proper.

## FOURTH COUNT

82.     Plaintiff, PCI, repeats and re-alleges the allegations set forth in Paragraphs 1-81 hereof as if set forth herein in their entirety.

83.     As set forth above, JLL started to bundle its technology offerings to its customers. Given the vast extent of its businesses, its recognition of the importance of technology to its customers and the connectivity between IntelliCommand and its other technological offerings, it is unclear if all work orders involving IntelliCommand in some fashion were reported to and/or provided to PCI while the PCI Agreement was in effect and it is assumed that they were not.

84.     Further, JLL also withheld from PCI that it was using its platform in connection with other technology offerings and that its doing so allowed JLL to avoid issuance of work orders which allowed it to reap the benefits without paying PCI pursuant to the PCI Agreement.

85.     Since JLL obtained funds that belonged to PCI, it held such funds in a fiduciary capacity for PCI.

86.     As a result, an accounting as to all revenue received by JLL, while the PCI Agreement was in effect, with respect to all technology compatible with IntelliCommand should be provided by JLL.

87.     In the alternative, PCI should be able to obtain discovery and/or perform an audit as to JLL's activities which would include financial information as to all technology compatible with IntelliCommand.

88.     If the accounting and/or audit indicates that JLL received revenue from the sale and/or use of IntelliCommand which did not involve work orders sent to PCI, then PCI should be paid all such revenues, plus interest, and JLL should be held liable for punitive damages for fraud.

WHEREFORE, Plaintiff PCI requests judgement as against JLL for:

(A)     An accounting and/or audit as to all revenue received by JLL, while the PCI Agreement was in effect, with respect to all technology compatible with IntelliCommand;

(B)     If the accounting and/or audit reveals that JLL received revenue from the sale of IntelliCommand which did not involve work orders sent to PCI, compensatory damages and punitive damages;

(C)     Interest;

(D)     Counsel Fees;

(E)     Costs; and

(F)     Such other relief as the Court deems proper.

(G)

## FIFTH COUNT

89.     Plaintiff Greenstar repeats and re-alleges all of the allegations set forth in Paragraphs 1-88 hereof as if set forth in their entirety.

90.     Pursuant to the Greenstar Agreement, Illinois law applies.

91.     As set forth above, JLL breached the Greenstar Agreement in multiple respects, including but not limited to not making payments it agreed to pay, not providing financial information when it agreed to provide same, not advising who was part of the IMT and not conducting timely meetings and not treating Greenstar fairly as agreed.

92.     As set forth above, other breaches related to JLL's failure to treat Greenstar fairly include its failure to disclose to Greenstar that it was forming and thereafter it had formed a new technology company, its efforts to buy out Greenstar's 35% interest free of cost, its claim that it failed to include in its information as to revenue and costs additional costs notwithstanding its employee's statement that it was late as to the report because it wanted to make certain it was

accurate and its failure to disclose to Greenstar that it was marketing its technology integrated with other technological offerings.

93.    If IntelliCommand was, in fact, doing as poorly as JLL ultimately reported to Greenstar (in manners that breached the Greenstar Agreement), then, during the course of the Greenstar Agreement, Greenstar could have provided advice, such as with respect to additional marketing efforts and/or cutting costs, which should have made IntelliCommand more profitable.

94.    Greenstar was damaged by JLL's breaches of the Greenstar Agreement.

95.    JLL is liable to Greenstar for multiple breaches of the Greenstar Agreement as detailed above..

WHEREFORE, Plaintiff Greenstar requests judgement as against JLL for:

(A)     Compensatory damages;

(B)     Interest;

(C)     Counsel Fees;

(D)     Costs; and

(E)     Such other relief as the Court deems proper.

## **SIXTH COUNT**

96.     Plaintiff, Greenstar, repeats and re-alleges the allegations contained in Paragraphs 1-95 hereof as if set forth herein in their entirety.

97.    JLL, by its actions detailed above, breached the express and implied covenant of good faith and fair dealing as it relates to the Greenstar Agreement.

98.    In addition, JLL defrauded Greenstar by withholding that the Platform was being used in connection with other JLL technology offerings;  by the actions indicated above by which JLL intentionally sought to keep Greenstar from knowing what was actually happening as to the

Platform and by its intentional efforts to "steal" the Platform and Software..  JLL knew that it was withholding information to which Greenstar was entitled, which resulted in such information being false; it intended that Greenstar rely thereon and Greenstar did reasonably rely thereon with the result that it incurred damages in the form of far less revenue being allocated to IntelliCommand which impacted the amounts to which it was entitled as well as the valuation of the IMT..

99.    Greenstar was damaged by JLL's breaches of the express and implied covenants of good faith and fair dealing with respect to the Greenstar Agreement.  The express covenant is set forth in the Code of Conduct which is an integral part of the Greenstar Agreement.

100.    JLL is liable to Greenstar for its breaches of the express and implied covenants of good faith and fair dealing related to the Greenstar Agreement, which caused Greenstar extensive damages in the form of lost revenues.

101.    JLL is also liable for fraud, which caused extensive damages to Greenstar in the form of lost revenue.

WHEREFORE, Plaintiff Greenstar requests judgement as against JLL for:

(A)     Compensatory damages;

(B)    Punitive damages;

(C)    Interest;

(D)    Counsel Fees;

(E)    Costs; and

(F)    Such other relief as the Court deems proper.

**SEVENTH COUNT**

102.    Plaintiff, Greenstar, repeats and re-alleges all of the allegations contained in Paragraphs 1-101of this First Amended Complaint as if set forth herein in their entirety.

103.     Illinois law recognizes that tortious conduct may arise from the same duties as are imposed by contract.  JLL's fraud and/or bad faith conduct toward Greenstar, as set forth in detail above and which was malicious, willful, wanton and/or oppressive, caused Greenstar to incur substantial losses and also renders JLL liable for fraud, bad faith in tort and punitive damages.

WHEREFORE, Plaintiff Greenstar requests judgement as against JLL for:

(A)     Compensatory damages;

(B)     Punitive damages;

(C)     Interest;

(D)     Counsel Fees;

(E)     Costs; and

(F)     Such other relief as the Court deems proper.

## EIGHTH COUNT

104.     Plaintiff, Greenstar, repeats and re-alleges the allegations set forth in Paragraphs 1-103 hereof as if set forth herein in their entirety.

105.      As set forth above, JLL started to bundle its technology offerings to its customers. Given the vast extent of its businesses, its recognition of the importance of technology to its customers and the connectivity between IntelliCommand and its other technological offerings, it appears that JLL did not properly report all revenue from sales involving IntelliCommand.

106.     JLL was acting as a fiduciary with respect to the funds that were collected by JLL with respect to the Greenstar Agreement in that JLL managed, controlled and distributed the funds earned from the IntelliCommand Platform and software.

107.    The Greenstar Agreement, in section 1.2, expressly provides for the right to have audits.

108.     As a result, an accounting and/or audit as to all revenue received by JLL, while the Greenstar Agreement was in effect, with respect to all technology compatible with IntelliCommand should be provided by JLL.

109.    If the accounting and/or audit indicates that JLL received revenue from IntelliCommand which was not reported to Greenstar, then Greenstar should be paid all such revenues, plus interest, and JLL should be held liable for punitive damages for fraud.

WHEREFORE, Plaintiff Greenstar requests judgement as against JLL for:

(A)    An accounting and/or audit as to all revenue received by JLL, while the Greenstar Agreement has been in effect, with respect to all technology compatible with IntelliCommand;

(B)    If the accounting and/or audit reveals that JLL received revenue from the sale of IntelliCommand which was not properly accounted for and/or reported to Greenstar, compensatory damages and punitive damages;

(C)    Interest;

(D)    Counsel Fees;

(E)    Costs; and

(F)    Such other relief as the Court deems proper.

## **NINTH COUNT**

110.    Plaintiff, Greenstar, repeats and re-alleges the allegations contained in Paragraphs 1-108 as if set forth herein in their entirety.

111.    As set forth in a letter dated April 28, 2020. JLL has decided to terminate the Greenstar Agreement effective August 31, 2020.

112.    The Greenstar Agreement provides that, in the event of termination of the agreement, a "fair value" of IMT will "be through a fair valuation of IntelliCommand by an independent entity." That. Valuation shall be based on  "current prevailing standards for similar building companies, considering future earnings potential and reasonable capital needs."  The Greenstar Agreement further provides that both parties may "provide the independent third party any and all documents that establish their respective investments in IntelliCommand." It then provides that Greenstar "shall be entitled to a one-time payment of 35% of the valuation resulting from above in exchange for a perpetual license to all source code in use and a release of any future claims against JLL or the IntelliCommand business."

113.    The termination notice from JLL did not propose that the parties undertake this valuation procedure nor did it "offer a proposal" as expressly permitted by the Greenstar Agreement.

114.    However, the parties ultimately agreed to a protocol and proceeded with the valuation.   However, JLL failed to adhere to the protocol and the Appraiser failed to require it to adhere to the protocol.  The Appraiser thereafter breached the protocol in multiple respects.

115.    The governing provision was that the "Valuation shall be based on a current prevailing standards for similar building system companies, considering future earnings potential and reasonable capital needs."  Here, the appraiser ultimately disclosed that he did not have expertise with respect to "similar building system companies" which involved high technology such as was involved here.  Further, JLL defrauded him and Greenstar by failing to provide him with documentation from JLL to allow him to determine the full future earnings potential, including from the use of the IntelliCommand Platform with other technology offerings from JLL.

116.     As a result, the ultimate appraisal amount was far below what it would have been if the protocol was adhered to and/or if JLL did not defraud Greenstar and the appraiser.

117.     Furthermore, JLL has not made any payment to Greenstar in connection therewith notwithstanding that it contends that the appraisal was proper.

118.     As a result of the foregoing, JLL is liable for fraud and/or breaches in connection with the appraisal process which caused Greenstar significant damages in that the appraised value was far too low.

WHEREFORE, Plaintiff Greenstar requests judgement as against JLL for:

(A)     Compensatory damages;

(B)     Punitive damages;

(C)     Interest;

(D)     Counsel Fees;

(E)     Costs;

(F)     If not compensated, injunctive relief as set forth above; and

(G)     Such other relief as the Court deems proper.

Dated: Florham Park, New Jersey
        February 21, 2023

**DREIFUSS BONACCI & PARKER. P.C.**

By: _____s/ David C. Dreifuss_____
        David C. Dreifuss, Esq. (NJ ID #: 015191977)
        26 Columbia Turnpike, North Entrance
        Florham Park, New Jersey 07932
        (973) 514-1414
        *Attorneys for Plaintiffs, Greenstar Technologies,*
        *LLC and Pacific Controls, Inc.*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


**DREIFUSS BONACCI & PARKER. P.C.**


By: _____ s/ David C. Dreifuss _____
David C. Dreifuss, Esq. (NJ ID #: 015191977)
26 Columbia Turnpike, North Entrance
Florham Park, New Jersey 07932
(973) 514-1414
*Attorneys for Plaintiffs, Greenstar Technologies,*
*LLC and Pacific Controls, Inc.*