**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| GREENSTAR TECHNOLOGIES, LLC AND PACIFIC CONTROLS, INC.,<br><br>               Plaintiffs,<br><br>v.<br><br>JONES LANG LASALLE AMERICAS, INC.,<br><br>               Defendant. | CIVIL ACTION NO.: 3:20-cv-07900 (GC-TJB) |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

David C. Dreifuss
(Attorney ID No. 15191977)
DDreifuss@dbplawfirm.com
**DREIFUSS, BONACCI & PARKER, PC**
26 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 514-1414

*Attorneys for Plaintiffs*
*Greenstar Technologies LLC. And Pacific Controls, Inc.*

*On the Brief:*
David C. Dreifuss, Esq.
Paul H. Mandal, Esq.
Margaret A. Palmeri, Esq

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF  FACTS ..................................................................................... 2

   A. Breaches of PCI and Greenstar Agreements ................................................ 2

   B. Breach of Good Faith and Fair Dealing and Fraud ..................................... 6

   C. Plaintiffs' Entitlement to an Accounting ...................................................... 8

   D. Breaches of Valuation Protocol ................................................................... 9

LEGAL ARGUMENT ............................................................................................. 9

   A. STANDARD OF REVIEW .......................................................................... 9

   B. JLL COMMITED MATERIAL BREACHES OF THE PCI AGREEMENT ..................... 12

      1. JLL has not established that the formation of the Greenstar Agreement constitutes a Novation .................................................................................. 12

      2. PCI has pled sufficient facts as to breach of the PCI Agreement ..................... 15

   C. THE AMENDED COMPLAINT ADEQUATELY ALLEGED CLAIMS OF BREACH OF THE GREENSTAR AGREEMENT ................................................. 22

   D. ACCOUNTINGS ARE WARRANTED ...................................................... 24

   E. GOOD FAITH AND FAIR DEALING ARE SUBSUMED INTO BREACH OF CONTRACT CLAIM ........................................................................................ 26

   F.   SPECIFIC PERFORMANCE ...................................................................... 28

   G.  BAD FAITH/FRAUD ................................................................................. 29

CONCLUSION ....................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3Com Corp. v. Elecs. Recovery Specialists, Inc.*, 104 *F. Supp. 2d* 932, 943 (N.D. Ill. 2000)...... 29

*ABM Marking, Inc. v. Zanasi S.R.L.*, 353 *F.3d* 541 (2003) ........................................................ 25

*Allied Waste Transp., Inc. v. John Sexton Sand & Gravel Corp.*, 13 C 1029, 2016 *WL* 3443897,

    at 20 (N.D. Ill. June 23, 2016)............................................................................................ 22

*Ansonia Properties, LLC v. Vasilj*, 2015 *IL App (1st)* 133846-U, ¶ 23, as modified

    (June 4, 2015) ...................................................................................................................... 28

*Astra Capital, LLC v. BCI Aircraft Leasing, Inc.*, 17 C 6431, 2019 *WL* 2248526, at *3 (N.D. Ill.

    May 24, 2019) ...................................................................................................................... 14

*Baker v. Puffer*, 299 *Ill.* 486, 490 (1921) ...................................................................................... 28

*Banco Del Estado v. Navistar Int'l Transp. Corp.*, 942 *F.Supp.* 1176, 1179 (N.D.Ill.1996) ....... 27

*Bank of Illinois in Mt. Vernon v. Bill's King City Stationery, Inc.*, 198 *Ill. App. 3d* at 436–37.... 29

*Bank One, Springfield v. Roscetti*, 723 *N.E.2d* 755,763 (Ill. Ct.App. 1999) ................................ 21

*Batteast Const. Co. v. Pub. Bldg. Comm'n of Chicago*, 195 *F. Supp. 2d* 1045, 1051 (N.D. Ill.

    2001)..................................................................................................................................... 26

*Bell Atl. Corp. v. Twombly*, 550 *U.S.* 544, 555 (2007) ................................................................. 10

*Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443–45 (7th Cir.1992) ........................... 21

*Brownmark Films, LLC v. Comedy Partners*, 682 *F.3d* 687, 690 (7th Cir. 2012) ....................... 14

*Burke v. N. Wabash Venture* 08-CV-5330, 2010 *WL* 2330334 at *2 (N.D. Ill. June 9, 2010) ..... 15

*Carrico v. Delp,* 141 *Ill.App.3d* 684, 690, 95 *Ill.Dec.* 880, 490 *N.E.2d* 972, 976 (1986)............. 21

*Cedar Park Cemetery Ass'n v. Village of Calumet Park,* 398 Ill. 324, 335, 75 N.E.2d 874

    (1947) ................................................................................................................................... 19

*Chemical Bank v. Paul,* 244 *Ill.App.3*d 772, 783, 185 *Ill.Dec*. 302, 614 *N.E.2d* 436, 442 (1993)21

*Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 887 (7th Cir. 2005) ............................................. 13

*Cincinnati Ins. Co. v. Leighton*, 403 *F.3d* 879, 889 (7th Cir. 2005)............................................ 13

Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr., 2009 *WL* 1329217, at *6 (N.D. Ill. May 13, 2009)....................................................................................................................................... 27

*Clay Fin. LLC v. Mandell*, 16 C 11571, 2018 *WL* 4682339, at *8 (N.D. Ill. Sept. 28, 2018)...... 12

*Conley v. Gibson*, 355 *U.S.* 41 (1957) .......................................................................................... 10

*Connick v. Suzuki Motor Co., Ltd*., 174 *Ill.2d* 482, 496 (1997).................................................... 30

*Cox v. Doctor's Assocs., Inc.,* 245 *Ill. App. 3d* 186, 220 (1993).................................................. 29

*Dodd v. Rotterman*, 330 Ill. 362, 370 (1928)............................................................................... 28

<u>*Elward v. Electrolux Home Products, Inc.*</u>, 264 *F. Supp. 3d* 877, 884–85 (N.D. Ill. 2017)... 11, 12

*Elward v. Electrolux Home Products, Inc*., 264 *F. Supp. 3d* 877, 886 (N.D. Ill. 2017).............. 11

*Elward v. Electrolux Home Products, Inc.,* 264 *F. Supp. 3d* 877, 887 (N.D. Ill. 2017) *Brownmark Films, LLC v. Comedy Partners*, 682 *F.3d* 687, 690 (7th Cir. 2012) ....................................... 14

*Facility Wizard Software Inc. v. Southeastern Technical Division*, 647 *F.Supp.2d* 938 (N.D. Ill. 2019)........................................................................................................................................ 15

*First Position, Inc. v. 3650, LLC*, 2013 *WL* 3835976, at *1 (Ill.Cir.Ct.)..................................... 11

*First Position, Inc. v. 3650, LLC*, 2013 *WL* 3835976, at 682 (Ill.Cir.Ct.).................................. 12

*Gallagher v. Lenart,* 226 Ill.2d 208, 233, 314 Ill.Dec. 133, 874 N.E.2d 43 (2007) .................... 20

*Geinosky v. City of Chicago,* 675 *F.3d* 743, 745 (7th Cir. 2012) ................................................. 11

*Greenbaum & Browne, Ltd. v. Braun,* 88 *Ill. App. 3d* 210, 213 (1980) ....................................... 13

*Happy R Sec., LLC v. Agri-Sources, LLC,* 988 *N.E.2d* 972, 981 (Ill.App.Ct. 2021)................... 28

*Hayward v. Burke*, 37 N.E. 846, 850 (Ill. 1894)........................................................................... 13

*Hepp v. Ultra Green Energy Servs. LLC*, No. 13 C 4692, 2014 *WL* 2154097, at *3 n.4 (N.D. Ill. May 22, 2014) ................................................................................................................. 11

*Hess v. Bresney,* 784 *F.3d* 1154, 1158-59 (7th Cir. 2015) ........................................................... 12

*Hickox v. Bell*, 195 *Ill. App. 3d* 976, 989-990 (1990) ................................................................ 19

*Illinois Sterling, Inc. v. KDI Corp.*, 33 *Ill.App.3d* 666 (1975) .................................................. 29

*In Bank of Illinois in Mt. Vernon v. Bill's King City Stationery, Inc.,* 198 *Ill. App. 3d* 434, 436–37 (1990) ..................................................................................................................... 29

In *Facility Wizard Software Inc. v. Southeastern Technical Division*, 647 *F.Supp.2d* 938 (N.D. Ill. 2019) ....................................................................................................................... 15

*In re Doyle,* 144 Ill.2d 451, 468, 163 Ill.Dec. 515, 581 N.E.2d 669 (1991) ................................ 19

*Industrial Specialty Chems., Inc. v. Cummins Engine Co. Inc.,* 902 *F.Supp.* 805, 811 (N.D.Ill.1995) .............................................................................................................. 26, 27

*International Capital Group v. Starrs*, 2010 *WL*3307345 (N.D. Ill. Aug. 19, 2010) .................. 16

*Karraker v. Eddleman*, 101 *Ill. App.* 23, 29 (Ill. App. Ct. 1902) ................................................ 13

*Kempner Mobile Electronics Inc. v. Southwestern Bell Mobile Systems*, 428 *F.3d* 706 (7th Cir. 2005) ......................................................................................................................... 26

*Ladien v. Presence RHC Corp.,* 2017 *IL App (1st)* 152778-U, ¶ 22 (June 30, 2017) ................. 28

*Lagen v. United Cont'l Holdings, Inc.*, 920 *F. Supp. 2d* 912, 918–19 (N.D. Ill. 2013) ............... 28

*LaScola v. U.S. Sprint Comm.,* 946 *F.2d* 559, 565 (7th Cir.1991) ............................................. 27

*Lenzi v. Morkin,* 103 Ill.2d 290, 293, 82 Ill.Dec. 644, 469 N.E.2d 178 (1984) .......................... 19

*Levenstein v. Salafsky*, 164 *F.3d* 345, 347 (7th Cir. 1998) ........................................................ 11

*Mann v. Kemper Financial Companies, Inc.*, *N.E.2d* 317, 327 (Ill. App. Ct. 1st Dist. 1992) ....... 24

*Martindell v. Lake Shore National Bank,* 15 *Ill.2d* 272, 286, 154 *N.E.2d* 683, 690 (1958) ......... 21

*Matthews v. Chi. Transit Auth.*, 2016 *IL* 117638, ¶ 77 ................................................................ 19

*Mayr v. Nelson Chesman & Co.*, 195 *Ill. App.* 587, 589 (Ill. App. Ct. 1915) ............................. 24

*Melikhov v. Drab*, No. 16 C 9332, 2017 *WL* 3234808 at *7 (N.D. Ill. July 31, 2017)................ 26

*Miyano Mach. USA, Inc. v. Zonar*, 1994 *WL* 233649, at *7 (N.D. Ill. May 23, 1994) ............... 30

*Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 *Ill.2d* 87 (1986) ............................................ 29

*Netterstrom v. Gallistel, 110 Ill. App. 352,* 354 (Ill. App. Ct. 1903)............................................ 13

*Palakovic v. Wetzel*, 854 *F.3d* 209, 219 (3d Cir. 2017)................................................................ 10

*People ex rel Hartigan v. Candy Club*, 149 *Ill. App.3d* at 501, 103 *Ill. Dec.* at 169, 501 *N.E.2d* at
    190.......................................................................................................................................... 24

*People ex rel Hartigan v. Candy Club,* 149 *Ill.App.3d* at 501, 103 *Ill.Dec.* at 169, 501 *N.E.2d* at
    191.......................................................................................................................................... 24

*Phillips & Arnold, Inc. v. Frederick J. Borgsmiller, Inc.*, 462 *N.E.2d* 924, 928 (Ill. App. Ct. 1st
    Dist. 1984)............................................................................................................................. 13

*Pielet v. Pielet*, 978 N.E.2d 1000, 1014 (Ill. 2012)....................................................................... 14

*Ronald McDonald House Charities of Chicagoland v. Winning Charities Illinois, LLC* 2013 WL
    5907668 (N.D. Ill. Nov. 4, 2013) ...................................................................................... 21

*Salvator v. Admiral Merchants Motor Freight*, 156 *Ill.App.3d* 930 (1987) ................................ 29

*Seban v. Cargurus, Inc*., No. 16 C 2531, 2016 *WL* 4709077, at *2 (N.D. Ill. Sept. 8, 2016) ...... 11

*Sharpe v. Jefferson Distrib. Co*., 1998 *WL* 786397, at *3 (N.D. Ill. Nov. 6, 1998) .................... 30

*Skokin v. Blackman, Kallick and Co.*, 184 *Ill.App.3d* 873 (1989) ................................................ 29

*Snap-On Inc. v. Ortiz*, 1999 *WL* 592194, at *13 (N.D. Ill. Aug. 3, 1999)................................... 27

*Tamayo v. Blagojevich*, 526 *F.3d* 1074, 1081 (7th Cir. 2008) .................................................... 12

*Thompson v. Gordon,* 241 Ill.2d 428, 441, 349 Ill.Dec. 936, 948 N.E.2d 39 (2011) .................. 20

*Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.,* 255 *F.3d* 397, 401 (7th Cir. 2001) 23

*Twombly and Ashcroft v. Iqbal*, 556 *U.S.* 662 (2009) .................................................................. 10

*Typpi v. PNC Bank, Nat'l Ass'n*, 2014 *WL* 296035, at *3 (N.D. Ill. Jan. 27, 2014) .................... 27

*U.S. Fid. & Guar. Co. v. Klein Corp.*, 558 *N.E.2d* 1047 (Ill. App. Ct. 1989) .............................. 14

*Utica Mut. Ins. Co. v. Vigo Coal Co.*, 393 *F.3d* 707, 712 (7th Cir. 2004) ................................... 13

*Wallace v. Prudential Insurance Co.*, 12 *Ill.App.3d* 623, 629–30 (1973) ................................... 29

*Westmeyer v. Flynn*. 382 *Ill. App. 3d* 952, 955 (I[st] Dist. 2008) ................................................ 11

## Rules

*Fed. R. Civ. P.* 12(b)(6) ............................................................................................................... 10

*Fed. R. Civ. P.* 8(a)(2) ............................................................................................................. 9, 12

Fed. R. Civ. P. 9(b) ...................................................................................................................... 27

Rule 8(a)(2) ................................................................................................................................... 10

## Treatises

20 Williston & Lord, *supra,* § 55:20, at 87; § 55:27, at 114 .............................................. 19, 20

American and English Encyclopedia of Law, 1st Ed., Vol. 16, pp. 862-7 ................................... 13

*Restatement (Second) of Contracts* § 355 (1977) ...................................................................... 29

## PRELIMINARY STATEMENT

Plaintiffs Pacific Controls, Inc. ("PCI") and Greenstar Technologies, LLC ("Greenstar") (PCI and Greenstar are jointly referred to as "Plaintiffs") submit the within brief in opposition to Defendant Jones Lang LaSalle Americas, Inc.'s ("JLL" or "Defendant") Motion to Dismiss the First Amended Complaint ("Amended Complaint" or "Am. Comp.") filed on March 31, 2023. Contrary to JLL's position as reflected in the motion papers, the 118 paragraph Amended Complaint sets forth more than adequate facts to support the causes of action alleged in the Amended Complaint. As alleged in the Amended Complaint, additional facts are solely within the purview and control of JLL. For example, after the Greenstar agreement was executed, the entire IntelliCommand operation was controlled exclusively by JLL. Essentially, JLL is seeking to be rewarded for its breaches by contending that the Plaintiffs should have set forth even more detail than JLL allowed the Plaintiffs to receive in breach of the Greenstar agreement.

Furthermore, as to both the PCI and the Greenstar agreements, JLL distorts and fails to include factual allegations in the Amended Complaint. For example, as to the PCI agreement, JLL ignores the exhibits incorporated therein and seeks to confuse the facts by treating PCI as if it were the same entity as Pacific Control Systems, LLC, which it is not.  Furthermore, JLL treats the Code of Conduct incorporated into the agreements as if it only applied to the Plaintiffs and not JLL, which is directly contrary to its stated terms. These and the many other facts that JLL distorts and/or fails to include are addressed in greater detail in the Statement of Facts and Argument sections, *infra*. In addition, JLL distorts Illinois law and/or its application to the factual allegations in the Amended Complaint. A careful review of the facts and the law, especially in light of the standards applicable to motions to dismiss and the fact that certain information is exclusively within JLL's control, should result in a complete denial of the motion to dismiss.

1

## STATEMENT OF FACTS

The facts set forth herein are facts from the Amended Complaint and/or the contracts attached to the Amended Complaint and to JLL's motion to dismiss as Exhibits A and B.  Please note that additional facts are also addressed in the Argument portion of this brief.

### A. Breaches of PCI and Greenstar Agreements

PCI and Greenstar are and, during all relevant times, were engaged in providing cloud technology services and materials to customers, including a platform, software and related services. (Am. Comp. ¶7).  In or about 2011, PCI and JLL entered into an agreement.  (Am. Comp. ¶8). The Agreement between PCI and JLL ("PCI Agreement") contemplated that JLL would aggressively market PCI's services (Am. Comp. ¶10) and products (Am. Comp. ¶10) to JLL's customers. While JLL contends that it did not agree to market the products and services, it fails to address the exhibits to the PCI Agreement, the purpose of the PCI Agreement and/or the parties' intentions in entering into the PCI Agreement.  As one example, Exhibit C incorporated into the PCI Agreement (the PCI Agreement with exhibits are Exhibit A to JLL's motion papers) indicates that PCI's products and services would be marketed to JLL's clients in industries involving data centers, general offices, hotels, manufacturing, retail, hospitals, warehouse and labs and/or to clients with spaces ranging from 1000 square feet to 10,000,000 square feet. (Am.Comp. ¶10) Exhibit C to the PCI Agreement also indicates that discounts would be provided based upon volumes of buildings ranging from a minimum of 100 buildings to a maximum of "Above 500 buildings." Those provisions clearly contemplate aggressive marketing by JLL. *Id.* The Amended Complaint also states that JLL was managing many buildings with a total square footage of more than two billion (2,000,000,000) square feet at the time the Agreement was entered into. (Am.Comp. ¶9) The potential revenue related to PCI's services arising out of JLL's relationships with the many tenants and its management of so much square footage was the primary reason for

PCI to enter into the PCI Agreement. (Am.Comp. ¶9) Additionally, JLL had indicated to PCI that it intended to market PCI's products/services throughout the world. (Am.Comp. ¶9)

Further, the PCI Agreement, as quoted in greater detail in the Amended Complaint (Am. Comp. ¶¶10-14), expressly and/or impliedly stated that JLL would be marketing PCI's Platform and Software to all of its clients. (Am. Comp. ¶15) Consistent with the PCI Agreement, PCI provided JLL with a business plan in 2012 to which no objection was made at a point where a reasonable person would have objected if he/she had any objection. (Am. Comp. ¶¶16,17). Based upon the growth potential reflected in the business plan and/or the terms of the PCI Agreement, PCI expended substantial sums making certain that it could comply with what it had agreed to. (Am. Comp. ¶¶18,19)  Section 6 of the PCI Agreement stated "During the term of this Agreement, PCI shall provide to JLL and its clients the training, support and maintenance services set forth in Schedule 2." The PCI Agreement contained no limitation upon which JLL clients. (Am.Comp. ¶12). Further, in the express terms of the PCI Agreement, JLL represented to PCI that "The relationships with our suppliers are based on the principle of fair and honest dealings at all times and in all ways." PCI reasonably relied upon that provision because JLL had control over much of the agreed upon performance, including but not limited to the issuance of work orders and the manner in which it marketed. (Am.Comp. ¶13).  The JLL Code of Conduct does not indicate that it only applies to the vendors and not to JLL itself as now alleged by JLL.

The Amended Complaint makes it clear that the PCI Agreement expressly and/or impliedly stated that JLL would be marketing PCI's Platform and Software to all of its clients, and that the PCI Agreement expressly stated that JLL would be marketing it to its clients in the referenced industries with the spaces being managed by JLL as per Exhibit C. (Am.Comp. ¶15).  It also alleges that JLL failed to do either.  (Am. Comp. ¶20)

3

PCI provided JLL with a Business Plan after the PCI Agreement was executed and JLL never indicated that said Business Plan was unrealistic, unreasonable and/or that it did not intend to act consistent therewith. (Am.Comp. ¶16-17). If a reasonable person disagreed with said Business Plan and/or considered it unreasonable and/or unrealistic, he/she would have expressed his/her views when or shortly after PCI presented said Business Plan. (Am.Comp. ¶17). Consistent with the PCI Agreement, PCI expended substantial sums, energy and resources making certain that it fully complied with its obligations. (Am.Comp. ¶19). However, PCI was unaware that JLL had intentionally not marketed its Platform and/or its Software as per the PCI Agreement and/or Business Plan when it transferred the Software and/or Platform to Greenstar and it was also unaware that JLL had planned on and/or started integration of PCI's Platform with others of its technology offerings at that time. (Am.Comp. ¶¶21,22). As a result of such actions and/or such representations by JLL, PCI did not realize what it had projected in the Business Plan and its revenues were a small fraction of what had been projected and/or contemplated by the express terms of the PCI Agreement. (Am.Comp. ¶23). Additionally, revenues were far less than they would have been if JLL had not breached the PCI Agreement. (Am.Comp. ¶23). Due to JLL's breaches, PCI indicated that it could no longer afford to maintain its efforts with respect to the software, platform and services. (Am.Comp. ¶25).

As a result of said actions and/or lack thereof by JLL, PCI incurred substantial losses. (Am. Comp. ¶¶23, 24). JLL's representations as to the market potential before and after the PCI Agreement as to PCI's software, platform and/or Services, were either grossly negligent, intentionally false or JLL failed to market same to its customers as represented and contemplated in the PCI Agreement. (Am.Comp. ¶20).

Greenstar and JLL then entered into an agreement. ("Greenstar Agreement"). The Greenstar Agreement included numerous provisions which JLL breached. (Am.Comp. ¶28-66). They include failing to notify Greenstar on a monthly basis of the net proceeds from the platform and software; failing to account for substantial revenues derived from the integration of the IntelliCommand Platform with other technology offerings of JLL; failing to schedule quarterly meetings; failing to submit a personnel plan; failing to pay the fees with respect to the licensing and agreements related to the Software and the Platform; not providing an annual operating budget and failing to treat Greenstar honestly and fairly as expressly provided in the Greenstar Agreement. (Am.Comp. ¶¶17-42)

Given the relationship between the parties, Greenstar had to rely heavily on JLL's good faith and fair and honest dealings as JLL had expressly agreed to in the agreements which are provisions that JLL breached. (Am. Comp. ¶¶42-47)

The Amended Complaint addresses in detail documents and facts which lead to the conclusion that JLL planned a course of conduct for years so that the Platform, workers, materials, software, codes, etc. would be within its exclusive control and to "steal" same away from first PCI and then Greenstar. ( Am. Comp. ¶¶49-62). As set forth therein:

> Such efforts included first getting PCI to spend tens of millions of dollars to render the technology compatible with JLL's technology; to then not market it as agreed so that PCI would lose substantial sums on its significant investment; then to agree to take on the PCI personnel involved with it and enter into an agreement whereby it gained a 65% interest in IntelliCommand and the related platform; then to keep Greenstar "in the dark" as to what JLL was doing with the technology by not conducting Advisory Committee meetings, advising Greenstar who were the members of the IMT and/or providing monthly reports; then to advise Greenstar that notwithstanding the latest reports IntelliCommand was losing money; then to offer to buy the remaining 35% interest for nothing while not advising Greenstar that JLL was investing a substantial sum into technology and/or that it was forming a new technology company. (Am. Comp. ¶62)

Further the First Amended Complaint clearly states that JLL breached the following Sections of the Greenstar Agreement: 1.1; 1.3; 1.4; 1.5; 1.7; 11; 13 and 21. (Am. Comp. ¶¶30- 42) Consistent therewith, it further alleges that  JLL failed to properly implement and operate the JLL IntelliCommand Management Team ("IMT"). (Am. Comp. ¶¶30-32. 39-41 ) JLL also failed to properly operate the Advisory Committee pursuant to the Greenstar Agreement as JLL failed to submit Personnel Plans, schedule quarterly meetings, and/or submit budgets to Greenstar. (Am. Comp. ¶¶36-39). Breaches of the PCI Agreement include not marketing as agreed and not treating PCI fairly as agreed (Am. Comp. ¶69) The consequences of the breaches/damages are also stated in detail.  (See, *e.g.,* Am. Comp. ¶¶49, 62-64,71, 77, 91-94)

**B. Breach of Good Faith and Fair Dealing and Fraud**

JLL breached its express and implied duties to act in good faith and fair dealings as to both PCI and Greenstar (please also see above). As alleged in detail in the Amended Complaint, JLL's actions clearly demonstrate that, as to PCI and/or Greenstar, it breached its own requirements that it treat its suppliers "based on the principle of fair and honest dealings at all times and in all ways." The Code of Conduct does not indicate that it only applies to vendors and not to JLL.

The relationship between PCI and JLL, and then between Greenstar and JLL, resulted in JLL controlling the relationships and ultimately (after Greenstar became involved) controlling the employees directly involved with the Platform and Software. PCI and Greenstar had to rely heavily on JLL's good faith and fair and honest dealings as it had expressly agreed to in the agreements and which provisions it breached. (Am. Comp. ¶¶42-47). That was also because the relationship involved JLL's marketing of PCI's services/ products to JLL's customers. (Am. Comp. ¶42) Additionally, Greenstar had to especially rely upon JLL's good faith and/or fair and honest dealings, as prior to entering the Greenstar Agreement, JLL insisted upon a 65% interest while it

assumed control over what had been PCI's employees and operation.  (Am. Comp. ¶44) Plaintiffs allege that "JLL planned a course of conduct for years so as to get the IntelliCommand platform, workers, materials, software, codes, etc. within its exclusive control and to "steal" it away from first PCI and then Greenstar." ( Am. Comp. ¶62)

JLL's apparent bad faith and arrogance, including its breaches of the Code of Conduct provisions as to treating suppliers honestly and fairly, was so great that after 2017, it did not even advise Greenstar of the identities of the IMT members. (Am. Comp. ¶41)

JLL stated at a meeting that "now that IntelliCommand is in-house", there would be a "continued push for greater international adoption."  Again, if it was marketing IntelliCommand to all of the industries in the PCI Agreement and/or as contemplated therein, there would have been no need to push for greater international adoption. (Am. Comp. ¶52)

It is clear from the allegations in the Amended Complaint that JLL did not treat PCI or Greenstar fairly (Am. Comp. ¶¶44-48) JLL planned a course of conduct for years to get the IntelliCommand platform, workers, materials, software, codes, etc. within its exclusive control and to "steal" it away from first PCI and then Greenstar.  (Am. Comp. ¶62)  Further, it is alleged that "JLL defrauded Greenstar by withholding that the Platform was being used in connection with other JLL technology offerings; by the actions indicated above by which JLL intentionally sought to keep Greenstar from knowing what was actually happening as to the Platform and by its intentional efforts to "steal" the Platform and Software." (Am. Comp.¶98)  Also, "JLL knew that it was withholding information to which Greenstar was entitled, which resulted in such information being false; it intended that Greenstar rely thereon and Greenstar did reasonably rely thereon, with the result that it incurred damages in the form of far less revenue being allocated to IntelliCommand which impacted the amounts to which it was entitled as well as the

valuation of the IMT." *Id.*

JLL's fraudulent conduct and bad faith are clearly pleaded in the Amended Complaint as set forth herein and as will be addressed in greater detail below. At the same time, it is contemplated that discovery from JLL will provide the Plaintiffs with even greater detail as to precisely what JLL planned/did and when.

### C. Plaintiffs' Entitlement to an Accounting

JLL deceived PCI and Greenstar and failed to accurately report crucial financial information. As set forth in the Amended Complaint, JLL started to bundle its technology offerings to its customers. Due to JLL's emphases on technology and the connectivity with IntelliCommand, it is unclear if all work orders involving IntelliCommand in some fashion were reported to and/or provided to PCI while the PCI Agreement was in effect (Am. Comp. ¶¶83-86, 105-108) While PCI is now aware that JLL breached the PCI Agreement in numerous respects, it can only obtain specifics as to the work orders from JLL since PCI would not have work orders that JLL obtained from its customers and failed to provide same to PCI.  However, PCI is now aware that JLL also withheld from PCI that it was using its platform in connection with other technology offerings which allowed it to reap the benefits without paying PCI pursuant to the PCI Agreement. (Am. Comp. ¶84). Additionally, since JLL obtained funds that belonged to PCI and Greenstar, it held such funds in a fiduciary capacity for PCI and Greenstar. (Am. Comp. ¶¶85, 106)

Both PCI and Greenstar are owed an accounting as to all revenue received by JLL, while the PCI and Greenstar Agreements were in effect, with respect to all technology compatible with IntelliCommand. (Am. Comp. ¶¶86, 108). Alternatively, Plaintiffs should be permitted to obtain discovery so as to perform an audit. (Am. Comp. ¶¶87, 108) Section 1.2 of the Greenstar Agreement expressly provides for the right to have audits. (Am. Comp. ¶107)

### D. Breaches of Valuation Protocol

When JLL notified Greenstar of its intent to terminate the Greenstar Agreement, it failed to propose valuation procedures or proposals as expressly provided by the Greenstar Agreement. (Am. Comp. ¶¶111,113) The Greenstar Agreement provides that, in the event of termination of the agreement, a "fair value" of IMT will "be through a fair valuation of IntelliCommand by an independent entity." (Am. Comp. ¶112)  The valuation was to be based on the "current prevailing standards for similar building companies, considering future earnings potential and reasonable capital needs." (Am. Comp. ¶112) The Greenstar Agreement further provided that both parties may "provide the independent third party any and all documents that establish their respective investments in IntelliCommand" and that Greenstar would be entitled to a "one-time payment of 35% of the valuation resulting from above in exchange for a perpetual license to all source code in use and a release of any future claims against JLL or the IntelliCommand business." (Am. Comp. ¶112)

JLL and Greenstar agreed to a valuation protocol but thereafter JLL failed to adhere to the protocol by refusing to submit complete financial and technological documents to the Appraiser and the Appraiser failed to enforce the protocol to comply with what the valuation was to be based upon. (Am. Comp. ¶114) The Appraiser disclosed that he did not have any expertise as to the complicated technology involved. (Am. Comp. ¶115) JLL's failure to provide documents resulted in fraud and a breach of the valuation protocol. (Am. Comp. ¶118)

### <u>LEGAL ARGUMENT</u>
### A. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) specifies that a civil complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P.* 8(a)(2). Such a statement "give[s] the defendant fair notice of what the . . . claim is and the

grounds upon which it rests." *Palakovic v. Wetzel*, 854 *F.3d* 209, 219 (3d Cir. 2017) (second alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 *U.S.* 544, 555 (2007)). A defendant contending that a complaint has not met this requirement may seek dismissal for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P.* 12(b)(6) The Supreme Court held in *Conley v. Gibson*, 355 *U.S.* 41 (1957), that "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45-46.

The Supreme Court subsequently revisited its interpretation of Rule 8(a)(2) in *Twombly and Ashcroft v. Iqbal*, 556 *U.S.* 662 (2009). The Court "retired" *Conley's* rule that courts could grant a motion to dismiss for failure to state a claim only if it was beyond doubt and the plaintiff could prove "no set of facts" that would entitle it to relief. *Twombly*, 550 *U.S.* at 561-63; *Iqbal*, 556 *U.S.* at 670. Instead, the Court explained that to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 *U.S.* at 678 (quoting *Twombly*, 550 *U.S.* at 570). Such plausibility exists if the facts alleged in the complaint allow for "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; see *Twombly*, 550 *U.S.* at 556.

To meet this plausibility standard, the complaint's factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 *U.S.* at 555. But "[a]sking for plausible grounds to infer [unlawful activity] does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [such activity]." *Id.* at 556. The facts alleged need not be "detailed," but a complaint must provide more than mere "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" without "further factual enhancement[s]." *Iqbal*, 556 *U.S.*

at 678 (first alteration in original); *Twombly*, 550 *U.S.* at 555. The Court explained that making this plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 *U.S.* at 679. However, a plaintiff is not required to show it is likely to prove its case: "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 *U.S.* at 556. The touchstone is whether the complaint " 'give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *Id*. at 555 (second alteration in original) (quoting *Conley*, 355 *U.S.* at 47)

Since the agreements involved here provide that Illinois law applies, the standard in Illinois is that, "Dismissal is warranted when, after considering the pleadings, affidavits, and supporting documents in a light most favorable to the nonmoving party, it is clearly apparent that no set of facts could be proven which would enable the plaintiff to recover." *First Position, Inc. v. 3650, LLC*, 2013 *WL* 3835976, at *1 (Ill.Cir.Ct.) *quoting Westmever v. Flvnn*. 382 *Ill. App. 3d* 952, 955 (l<sup>sl</sup> Dist. 2008). If the factual content of issues as to a complaint concerns an affirmative defense, rather than the elements of plaintiffs' claims, the documents are likely beyond the scope of a court's inquiry at the pleading stage. *Seban v. Cargurus, Inc*., No. 16 C 2531, 2016 *WL* 4709077, at *2 (N.D. Ill. Sept. 8, 2016) (citing *Geinosky v. City of Chicago*, 675 *F.3d* 743, 745 (7th Cir. 2012); *Levenstein v. Salafsky*, 164 *F.3d* 345, 347 (7th Cir. 1998); *Hepp v. Ultra Green Energy Servs. LLC*, No. 13 C 4692, 2014 *WL* 2154097, at *3 n.4 (N.D. Ill. May 22, 2014)). *Elward v. Electrolux Home Products, Inc*., 264 *F. Supp. 3d* 877, 886 (N.D. Ill. 2017)

Under the federal notice pleading standards, a complaint "need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice of the claim and its basis." <u>*Elward v. Electrolux Home Products,*</u>

*Inc.*, 264 *F. Supp. 3d* 877, 884–85 (N.D. Ill. 2017) citing *Tamayo v. Blagojevich*, 526 *F.3d* 1074, 1081 (7th Cir. 2008) *see also Fed. R. Civ. P.* 8(a)(2). It should be clear that the Amended Complaint provides JLL with far more details than the "notice requirement" and that it more than complies with the federal and Illinois standards.

### B. JLL COMMITED MATERIAL BREACHES OF THE PCI AGREEMENT

To prevail on a breach of contract claim under Illinois law, a plaintiff must prove the following: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney,* 784 *F.3d* 1154, 1158-59 (7th Cir. 2015); see also *Clay Fin. LLC v. Mandell*, 16 C 11571, 2018 *WL* 4682339, at *8 (N.D. Ill. Sept. 28, 2018).  Here, neither party disputes that there were valid and enforceable contracts but, again, the standard is whether the Amended Complaint alleges that there were contracts and it clearly does.  *(e.g.* Am. Compl. ¶¶ 8, 26).  As to performance by the plaintiffs, that is also expressly pled in the Amended Complaint. (Am. Comp. ¶¶19, 41) Breaches by JLL have been alleged in detail as to both agreements as set forth in the Statement of Facts, *infra*; in detail in the Amended Complaint and in greater detail below. The Amended Complaint, throughout the general allegations and in the specific counts, also alleges resultant injury to PCI and/or Greenstar.  (See, e.g., ¶¶49, 62-64,71,76, 77, 91-94) As a result, it should be clear that the Amended Complaint satisfies the requirements of Illinois law as to alleged breaches of contract.

### 1. JLL has not established that the formation of the Greenstar Agreement constitutes a Novation

JLL's arguments regarding novation are improper and premature. JLL failed to prove all the elements of a novation under Illinois law by a preponderance of the evidence.  In Illinois, "the party asserting discharge or novation has the burden of proving novation by a preponderance of the evidence." *First Position, Inc. v. 3650, LLC*, 2013 *WL* 3835976, at 682 (Ill.Cir.Ct.) *citing*

*Greenbaum & Browne, Ltd. v. Braun,* 88 *Ill. App. 3d* 210, 213 (1980). Further, the Court must consider that novation is not easily presumed. It must clearly appear before the court will recognize it. *Netterstrom v. Gallistel, 110 Ill. App. 352,* 354 (Ill. App. Ct. 1903); see also *Hayward v. Burke*, 37 *N.E.* 846, 850 (Ill. 1894).

JLL cites to the four elements of a novation as: "[1] a previous, valid obligation; [2] a subsequent agreement of all the parties to the new contract; [3] the extinguishment of the old contract; and [4] the validity of the new contract." *Cincinnati Ins. Co. v. Leighton*, 403 *F.3d* 879, 889 (7th Cir. 2005) (quoting *Phillips & Arnold, Inc. v. Frederick J. Borgsmiller, Inc*., 462 *N.E.2d* 924, 928 (Ill. App. Ct. 1st Dist. 1984)). In the *Cincinnati* case, the Court ruled that when considering evidence to support a claim of novation, the courts must be mindful that any proof of a novation must be clear. *Id.* See also *Utica Mut. Ins. Co. v. Vigo Coal Co*., 393 *F.3d* 707, 712 (7th Cir. 2004). Also, "All the parties, not only to the new contract, but also to the one for which the new contract is substituted, must consent to the novation; the parties to the original contract must consent in order to have that extinguished, and the parties to the new contract in order to have a valid obligation substituted for the old." *Karraker v. Eddleman*, 101 *Ill. App.* 23, 29 (Ill. App. Ct. 1902) quoting the American and English Encyclopedia of Law, 1st Ed., Vol. 16, pp. 862-7. Further, the obligee must assent to the substitution and agree to release the obligor for a novation to occur. *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 887 (7th Cir. 2005).

Here, there is no evidence submitted that PCI agreed to release JLL (nothing is so stated in the Greenstar Agreement); that PCI and Greenstar are one and the same entities (they are not); that PCI and Greenstar have the same ownership (they do not) ; that PCI agreed to a full extinguishment of all terms of the PCI Agreement (again, that is not so stated in the agreement) and/or that the agreements cover the precise same subject matter.  In a case similar to this case, the United States

13

District Court for the Northern District of Illinois denied defendants' motion for summary judgement as they failed to support their argument that any later agreement regarding the same subject matter constitutes a novation.  It ruled that such was "inconsistent with the principle that courts do not presume the parties' intent to form a novation" *Astra Capital, LLC v. BCI Aircraft Leasing, Inc.*, 17 C 6431, 2019 *WL* 2248526, at *3 (N.D. Ill. May 24, 2019). See also *Pielet v. Pielet*, 978 *N.E.2d* 1000, 1014 (Ill. 2012). Additionally, in *Astra*, the Court denied the defendants' motion as an issue of fact existed as the parties disputed whether the second agreement covered the same subject matter as the first agreement. *Astra* at 3.

Illinois courts have also held that novation is an affirmative defense which must be specifically pled, *U.S. Fid. & Guar. Co. v. Klein Corp.*, 558 *N.E.2d* 1047 (Ill. App. Ct. 1989) and that a "Dismissal based upon affirmative defenses is rare because "these defenses typically turn on facts not before the court at [this] stage." *Elward v. Electrolux Home Products, Inc.,* 264 *F. Supp. 3d* 877, 887 (N.D. Ill. 2017); *Brownmark Films, LLC v. Comedy Partners*, 682 *F.3d* 687, 690 (7th Cir. 2012).

When applying Illinois law to the facts of this case, JLL's motion must be denied. JLL ignores the fact that there are issues as to the first three elements of the novation test. Although the Greenstar Agreement was subsequent to the PCI Agreement, the parties were not the same. The PCI Agreement establishes PCI as the developer of Software and a Platform and gives significant details as to the services and products JLL agreed to market to its customers. In contrast, Greenstar was not involved in the creation of the Software and Platform. Further, the Greenstar Agreement focuses in part on the creation, operation and management of IMT, which did not exist under the PCI Agreement. Again, there is also nothing indicating an intent by PCI to release JLL and/or to discharge JLL as to all obligations under the PCI Agreement.  JLL indicates that "Importantly, the

Greenstar Agreement contained an 'Entire Agreement' provision that expressly stated it superseded any 'prior agreements with any predecessors or affiliates of Greenstar Technologies LLC including Pacific Control Systems, LLC." (JLL Brief, page 5) However, while it specifically mentions one company, it does not mention PCI.

Furthermore, as set forth in the Statement of Facts, *infra*, and in the Amended Complaint, JLL breached the PCI Agreement by failing to market its products as contemplated by the Agreement in multiple respects and JLL withheld significant information from PCI as to its efforts with PCI's platform and other technology offerings of JLL.  PCI was not aware of JLL's breaches and/or fraudulent activities until after the Greenstar Agreement was executed. There is nothing in the Greenstar Agreement indicating that PCI was releasing JLL as to breaches of which it was aware and/or as to breaches and/or fraud of which it was unaware.  The Plaintiffs anticipate that discovery will reveal more evidence with respect to JLL's actions against PCI and PCI should not be denied the opportunity to engage in discovery.

### 2. PCI has pled sufficient facts as to breach of the PCI Agreement

Defendant's reliance on the unpublished opinion of *Burke v. N. Wabash Venture* 08-CV-5330, 2010 *WL* 2330334 at *2 (N.D. Ill. June 9, 2010) is misplaced as numerous Illinois cases hold that it is not necessary for a Plaintiff to identify a specific contract provision that was breached in order to plead breach of contract. In *Facility Wizard Software Inc. v. Southeastern Technical Division*, 647 *F.Supp.2d* 938 (N.D. Ill. 2019), the Court expressly refused to dismiss the Plaintiff's breach of contract claims where, as here, the request to dismiss was based upon the fact that the claim did not specifically set forth the provision of the contract that the Plaintiff claimed was breached. In fact the *Facility Wizard* court stated that:

> at the motion to dismiss stage, a court is not testing the merits of the claim, but the
> sufficiency of the allegations… In the instant case, FWS specifically alleges facts that put

CMHA on notice that its use of FWS's trade secrets and confidential information was unjustified and exceeded the terms of the License Agreement. *Id.* at 950.

Similarly, in *International Capital Group v. Starrs*, 2010 *WL*3307345 (N.D. Ill. Aug. 19, 2010), the Court indicated that the plaintiff is not required to identify a specific contract provision that was breached in order to plead breach of contract, holding that:

> (W)e agree with ICG that a plaintiff is not required to identify a specific contract provision that was breached in order to plead breach of contract under the federal pleading standard, but a plaintiff must still plead enough facts to establish a breach, for example, the existence of some unsatisfied obligation.

The following paragraphs of the Amended Complaint include allegations as to the manner in which JLL breached terms of the PCI Agreement:

> 10. The PCI Agreement contemplated that JLL would aggressively market PCI's services to its customers. For example, it indicates that PCI was offering to provide its software, platform and services to JLL and its clients.  It indicates that JLL desires the software, platform and services.  As per Exhibit C thereto, which was expressly incorporated by reference, it was anticipated that PCI's software, platform and services would be marketed by JLL to clients in the following industries: Data Centers; General Offices; Hotels; Manufacturing; Retail; Hospitals; Warehouse and Labs. The same exhibit also contemplates that the JLL client spaces would range from 1000 square feet to 10,000,000 square feet and discounts would be provided based upon volumes of buildings ranging from a minimum of 100 buildings to a maximum of "Above 500 buildings."
>
> 11. Pursuant to the PCI Agreement, the starting point for PCI to provide its software, platform and/or services to "JLL clients or others at the Installation Site(s)" was for JLL to provide notice to PCI of a work order issued in accordance with the PCI Agreement.  Thus, JLL controlled the marketing of PCI's software, platform and/or services and represented that it would be marketing same to clients in the industries identified above, with square footages identified above and/or volumes of buildings identified above..  PCI relied upon those provisions as well as the other provisions to which reference is made in this pleading as consideration for the significant efforts that PCI had undertaken and was continuing to undertake so that it would fulfill its obligations under the PCI Agreement, which it did.  JLL breached the PCI Agreement by failing to market PCI's Platform, Software and/or services in the manner contemplated by the PCI Agreement.
>
> 13. Pursuant to the PCI Agreement, JLL represented that "The relationships with our suppliers are based on the principle of fair and honest dealings at all times and in all ways."  (Section 21).  PCI relied upon that provision especially here because JLL had control over so much of the agreed upon performance, including but not limited to the issuance of work orders and the manner in which it marketed.

15. The PCI Agreement expressly and/or impliedly stated that JLL would be marketing PCI's Platform and Software to all of its clients.  In the alternative, it expressly and/or impliedly stated that JLL would be marketing it to its clients in the above referenced industries with the size spaces being managed by JLL set forth on Exhibit C.

16. Consistent with the parties' intentions as reflected in the PCI Agreement, in or about September, 2012, PCI provided JLL with a Business Plan (the "Business Plan").  JLL never indicated that said Business Plan was unrealistic, unreasonable and/or that it did not intend to act consistent therewith.

17. If a reasonable person disagreed with said Business Plan and/or considered is unreasonable and/or unrealistic, he/she would have expressed his/her views when or shortly after PCI presented said Business Plan.  The failure of any representatives of JLL to express such sentiments meant that it impliedly agreed therewith.

18. Said Business Plan identifies actions and efforts which were anticipated by PCI based upon input and representations from defendant JLL.  The Business Plan states: JLL is a financial and professional services firm specializing in real estate. JLL offers integrated services to clients seeking increased value by owning, occupying or investing in real estate. JLL is an industry leader in property and corporate facilities management services, with a portfolio of approximately 2.1 billion square feet worldwide. . . .

The partnership agreement signed in October 2011 has tenure of ten years. PCI and JLL envision huge growth potential for the distinctive technology backed service. The companyis currently having a strong pipeline of close to 60 potential customers from various industry groups, most of which are expected to be signed within the next six to twelve months.  As of now, the combined value of the proposals amount to approx. USD 1.5 million, with an average annual monitoring fee per customer of approx. USD 26,000.  PCI forecast its revenue to grow at a CAGR (Compounded Annual Growth Rate) of 122.8% during the next five years to touch USD 143.6 million in 2017.

19. Consistent therewith and/or the PCI Agreement, PCI expended substantial sums, energy and resources making certain that it was in a position to fully comply with its obligations pursuant to the PCI Agreement. PCI did fully comply with its contractual obligations.

20. JLL's representations to PCI as to the market potential for PCI's software, platform and/or Services, made both before and after the PCI Agreement was executed, were either grossly negligent, intentionally false or JLL failed to market same to its customers as represented and contemplated in the PCI Agreement.

22. In addition, unbeknownst to PCI at the time, JLL planned on and/or had started integration of PCI's Platform with other technology offerings of JLL. JLL intentionally withheld same from PCI.  That means that JLL was able to avoid the work order process by using the Platform for other offerings.

23. As a result of such actions and/or such representations by JLL, PCI did not realize what it had projected in the Business Plan quoted above and, in fact, its revenues were a small fraction of what had been projected and/or contemplated by the express terms of the PCI Agreement.  The revenues were also far less than they would have been if JLL had not breached the PCI Agreement

24. JLL's misrepresentations and/or breaches caused PCI to incur substantial losses and/or realize far less revenue than it would have realized if JLL had not breached the PCI Agreement.

25. Ultimately, PCI indicated that it could no longer afford to maintain its efforts with respect to the software, platform and services. That was as a result of JLL's breaches. It then proposed that JLL consider entering into an agreement with respect thereto with a company named Greenstar..

33. JLL also represented to both entities, as expressly stated in both the PCI Agreement (Section 21) and the Greenstar Agreement (Section 11) that its Code of Conduct required it to treat them fairly at all times and in all ways.  That representation was especially important to both PCI and Greenstar in light of the huge disparity in resources as between them and JLL.

34. Notwithstanding said representations, JLL failed to treat either PCI or Greenstar fairly and apparently decided that its size would allow it to treat the much smaller companies unfairly and that it could do so with impunity.

45. As reflected by the various breaches of the PCI Agreement as set forth above, JLL did not treat PCI fairly.

46. As reflected by the various breaches of the PCI Agreement set forth above, JLL breached the implied covenant of good faith and fair dealing with respect to PCI.

49. Such conduct caused PCI substantial losses in terms of the significant sums it paid to continue to develop and or improve upon IntelliCommand and the substantial revenue it had projected, based upon input from JLL, which was never realized and/or the substantial revenue it would have received if JLL had complied with the PCI Agreement.  In fact, it was as a result of JLL's actions that PCI could not afford to continue to incur the costs associated with its responsibilities under the PCI Agreement which resulted in its arranging for Greenstar to enter into an agreement with JLL and the need to provide JLL with a 65% interest in what had been PCI's operation of IntelliCommand.

50. Given the provisions of the PCI Agreement, that JLL was an industry leader in real estate management and related matters, given the vast amount of real estate which it was managing, given its reported emphasis on technology such as that in connection with which PCI was involved and given the communications as between JLL and PCI, PCI was led to believe that JLL would market its products and services to virtually all of JLL's customers and that such efforts should result in far more work orders than occurred.

51. That JLL had not marketed IntelliCommand to the extent contemplated was clear from the IMT meeting which occurred on December 2, 2016, which was the last such meeting of which Greenstar was advised.  At the December 2, 2016 IMT meeting, it was announced that "JLL leadership reaffirmed support for expansion of" IntelliCommand.  If JLL had been marketing IntelliCommand as contemplated in the PCI Agreement, there would have been no need for the JLL leadership to agree to expand IntelliCommand.

52. In fact, JLL actually stated at that meeting that "now that IntelliCommand is in-house", there would be a "continued push for greater international adoption." Again, if it was marketing IntelliCommand to all of the industries contemplated in

> the PCI Agreement and/or as contemplated therein, there would have been no need to push for greater international adoption.
> 66. Said actions, individually and/or in combination, are clearly in breach of JLL's agreements to treat first PCI and then Greenstar fairly at all times and in all ways.
> 69. As set forth above, JLL breached the PCI Agreement in multiple respects, including but not limited to not marketing Intellicommand as agreed in the PCI Agreement and not treating PCI fairly as expressly agreed in the PCI Agreement.

The Amended Complaint also alleges that JLL's efforts to steal the IntelliCommand platform, workers, materials software, codes included "first getting PCI to spend tens of millions of dollars to render the technology compatible with JLL's technology; to then not market it as agreed so that PCI would lose substantial sums on its significant investment; then to agree to take on the PCI personnel involved with it . . ." (Am. Comp. ¶ 62) It further alleges that "PCI was damaged by JLL's breaches of the PCI Agreement." (Am. Comp. ¶ 71).

Defendant's argument that the lack of an express contractual provision indicating that JLL would market PCI's software means that Plaintiffs cannot maintain a breach of contract complaint, flies in the face of both Illinois law and the terms of the contract and its exhibits. An Illinois court's primary goal is to ascertain and give effect to the intention of the parties at the time the contract was formed. *Matthews v. Chi. Transit Auth.*, 2016 *IL* 117638, ¶ 77. Illinois courts determine the intention of the parties by considering the contract as a whole but they may resort to extrinsic evidence to explain an ambiguity in the contract. *Hickox v. Bell*, 195 *Ill. App. 3d* 976, 989-990 (1990).

> In construing a contract, the primary goal is to ascertain and give effect to the intention of the parties at the time the contract was formed. *In re Doyle,* 144 Ill.2d 451, 468, 163 Ill.Dec. 515, 581 N.E.2d 669 (1991); *Lenzi v. Morkin,* 103 Ill.2d 290, 293, 82 Ill.Dec. 644, 469 N.E.2d 178 (1984); *Cedar Park Cemetery Ass'n v. Village of Calumet Park,* 398 Ill. 324, 335, 75 N.E.2d 874 (1947). Where no ambiguity exists, the intent of the parties at the time the contract was entered into must be ascertained from the language of the contract itself. *In re Doyle,* 144 Ill.2d at 468, 163 Ill.Dec. 515, 581 N.E.2d 669; *Lenzi,* 103 Ill.2d at 293, 82 Ill.Dec. 644, 469 N.E.2d 178; 20 Williston & Lord, *supra,* § 55:20, at 87; § 55:27, at 114. A contract must be construed as a whole, viewing particular terms or provisions in the context

19

of the entire agreement. *Thompson v. Gordon,* 241 Ill.2d 428, 441, 349 Ill.Dec. 936, 948 N.E.2d 39 (2011); *Gallagher v. Lenart,* 226 Ill.2d 208, 233, 314 Ill.Dec. 133, 874 N.E.2d 43 (2007); 20 Williston & Lord, *supra,* § 55:20, at 87; § 55:27, at 114. Therefore, the parties' intent will not be ascertained by viewing a clause or provision in isolation. *Thompson,* 241 Ill.2d at 441, 349 Ill.Dec. 936, 948 N.E.2d 39; *Gallagher,* 226 Ill.2d at 233, 314 Ill.Dec. 133, 874 N.E.2d 43.

The PCI Agreement includes provisions as to JLL's clients, without any limitation thereon. For example, it provides that PCI shall provide the Software, Platform and Services to JLL "and its clients" (JLL motion papers, Exhibit A, page 1); that JLL "desires to secure the Software, Platform and the Services by PCI" for its clients' installation sites (*Id.*) and "The parties agree that PCI will provide the Services to JLL clients..." (*Id.* at Section 2.3) As set forth in the Amended Complaint,  the PCI Agreement expressly provides that Exhibit C was incorporated by reference and Exhibit C addresses the marketing of PCI's Platform and Software to JLL's clients in the industries of Data Centers, General Offices, Hotels, Manufacturing; Retail; Hospitals, Warehouse and Labs and also contemplates same being marketed in connection with spaces ranging from 1,000 square feet to 10,000,000 square feet as well as with volumes of buildings ranging between 100 and more than 500. Consistent therewith, as set forth in Paragraph 12 of the Amended Complaint, Section 6 of the PCI Agreement provides that "During the term of this Agreement, PCI shall provide to JLL and its clients".  That means that PCI shall provide same to JLL's clients, not some of the clients, and the only way for that to occur as per the PCI Agreement was for JLL to get work orders from its clients which it could only obtain if the clients were aware of the Platform and Software as a result of JLL's marketing of same. Again, the issue now is not whether those types of provisions are conclusive, but rather whether the intent of the parties as reflected in the PCI Agreement contemplates that JLL would market PCI's Platform and Software to its clients. Succinctly stated, that is precisely what the Agreement is about.

Additionally, Illinois law provides that every contract implies good faith and fair dealing between the parties to it. *Bank One, Springfield v. Roscetti*, 723 *N.E.2d* 755,763 (Ill. Ct.App. 1999), citing *Martindell v. Lake Shore National Bank,* 15 *Ill.2d* 272, 286, 154 *N.E.2d* 683, 690 (1958). Good faith requires the party vested with contractual discretion to exercise it reasonably, and it may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties. *Id.* citing *Carrico v. Delp,* 141 *Ill.App.3d* 684, 690, 95 *Ill.Dec.* 880, 490 *N.E.2d* 972, 976 (1986); see also *Chemical Bank v. Paul,* 244 *Ill.App.3*d 772, 783, 185 *Ill.Dec*. 302, 614 *N.E.2d* 436, 442 (1993). Here, there was also an express duty of good faith and fair dealing in that, as set forth in the Amended Complaint (e.g., Am. Comp. ¶ 13), there is an express provision that JLL's relationship with suppliers, such as PCI, "are based on the principle of fair and honest dealings at all times and in all ways." (See also JLL motion papers, Exhibit A, page 6, section 21).  That is an express good faith provision included in both contracts.

Finally, Defendant's reliance on the unpublished *Ronald McDonald House Charities of Chicagoland v. Winning Charities Illinois, LLC* 2013 WL 5907668 (N.D. Ill. Nov. 4, 2013) opinion is flawed. This opinion provides that:

> To establish a breach of the implied duty of good faith and fair dealing, a party must show "that the contract vested the opposing party with discretion in performing an obligation under the contract and the opposing party exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties. *LaSalle Bank,* 588 F.Supp.2d at 857 (*citing Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443–45 (7th Cir.1992)).

Again, in this case, JLL had the discretion as to how to market PCI's Platform and Software to its many customers, including those in the specified industries, and the Amended Complaint expressly states that it failed to do so as well as that its failure to do so was part of a scheme to get control over PCI's platform, equipment, personnel and services. (Am. Comp. ¶ 62) It is hard to imagine

21

allegations of greater bad faith conduct than using bad faith breaches to "steal" someone else's business.

## C. THE AMENDED COMPLAINT ADEQUATELY ALLEGED CLAIMS OF BREACH OF THE GREENSTAR AGREEMENT

The Amended Complaint expressly sets forth the specific provisions of the Greenstar Agreement that JLL has breached and the breaches thereof. (Am. Comp. ¶¶ 28-31, 33-42, 47, 48) For purposes of brevity, we will not repeat the standards applicable under Illinoi law as to allegations in a complaint as to breach of contract. The Amended Complaint includes express allegations that Plaintiffs performed their contractual obligations (Am. Comp. ¶¶19, 41) and includes over 15 paragraphs as to breaches of the Greenstar Agreement by JLL. (Am. Comp. ¶¶ 28-31, 33-42, 47, 48) The Amended Complaint also alleges that the breaches were part of JLL's "planned . . . course of conduct . . . so as to get the IntelliCommand platform, workers, materials, software, codes, etc. within its exclusive control and 'steal' it away from first PCI and then Greenstar." (Am. Comp. ¶62)  It further alleges that if IntelliCommand was actually "doing as poorly as JLL ultimately reported to Greenstar (in manners that breached the Greenstar Agreement), then, during the course of the Greenstar Agreement, Greenstar could have provided advice, such as with respect to additional marketing efforts and/or cutting costs, which should have made IntelliCommand more profitable" (Am. Comp. ¶ 93) and that "Greenstar was damaged by JLL's breaches of the Greenstar Agreement." (Am. Comp. ¶ 94) Thus, all of the elements of breach of contract have been alleged in the Amended Complaint.

JLL cites to *Allied Waste Transp., Inc. v. John Sexton Sand & Gravel Corp.*, 13 C 1029, 2016 *WL* 3443897, at 20 (N.D. Ill. June 23, 2016), but fails to mention that the defendant's motion for summary judgment there (as to the damages related to its breach of contract claims) was

denied. Additionally, the Court in *Allied* stated: "Therefore, under Illinois law, it is necessary to show damages—not the specific amount, but rather that the plaintiff did, in fact, suffer some damages" quoting *Transp. & Transit Assocs., Inc. v. Morrison Knudsen Corp.,* 255 *F.3d* 397, 401 (7th Cir. 2001).  Here, as set forth in the paragraphs identified above, Greenstar has alleged that JLL's breaches caused it to incur damages.

In addition to those express allegations, again, Plaintiffs allege that "JLL planned a course of conduct for years so as to get the IntelliCommand platform, workers, materials, software, codes, etc. within its exclusive control and to "steal" it away from first PCI and then Greenstar." (Am. Comp. ¶62)  Such efforts included getting PCI to spend tens of millions of dollars to develop the technology; to then not market it as agreed; then to agree to take on the PCI personnel involved with it and enter into an agreement whereby it gained a 65% interest in IntelliCommand and the related platform; then to keep Greenstar 'in the dark' as to what JLL was doing with the technology by not conducting Advisory Committee meetings, advising Greenstar who were the members of the IMT and/or providing monthly reports; then to advise Greenstar that IntelliCommand was losing money; then to offer to buy the remaining 35% interest for nothing while not advising Greenstar that JLL was investing a substantial sum into technology and/or that it was forming a new technology company. *Id.*

Finally, Plaintiffs also properly allege that JLL used the IntelliCommand platform to develop its applications such as Corrigo and now denies same to decrease the value of the 35% interest in IntelliCommand that Greenstar is owed as well as the revenues to which Greenstar is entitled. The integration of IntelliCommand with Corrigo should have had a huge impact on the valuation of the business. However, it requires a technological ability to determine what an appropriate apportionment would have been of the Corrigo net revenue to IntelliCommand and

23

additional information from JLL that it refuses to provide. As the valuation procedures outlined in the Greenstar Agreement have not occurred properly (Am. Comp., Ninth Count), JLL has committed yet another breach as well as fraud.

### D. ACCOUNTINGS ARE WARRANTED

The case cited by JLL for the proposition that the Plaintiffs are not entitled to an accounting actually establishes that an accounting is appropriate in this matter. In *Mann v. Kemper Financial Companies, Inc.*, *N.E.2d* 317, 327 (Ill. App. Ct. 1st Dist. 1992), the Court stated that, "(A)lthough equitable remedies are denied when there is an adequate remedy at law, there is an exception for when an accounting action is sought based upon a breach of a fiduciary duty so that a plaintiff may proceed with the action." *Id.*, citing (*People ex rel Hartigan v. Candy Club,* 149 *Ill.App.3d* at 501, 103 *Ill.Dec.* at 169, 501 *N.E.2d* at 190.)

In *Hartigan,* the Court overturned a lower court decision to dismiss the State's complaint, seeking, *inter alia*, to compel the estate of the decedent to provide an accounting regarding the assets of a club. *People ex rel Hartigan v. Candy Club*, 149 *Ill. App.3d* at 501, 103 *Ill. Dec.* at 169, 501 *N.E.2d* at 190. The Court held that, "although it is true, as defendant contends, that equitable remedies are denied when there is an adequate remedy at law, this court has recognized an exception in cases in which an accounting is sought based on a breach of a fiduciary duty. *Id.*, citing *Mayr v. Nelson Chesman & Co*., 195 *Ill. App*. 587, 589 (Ill. App. Ct. 1915). The court held that the complaint alleged that "(the decedent) was a fiduciary of the Candy Club in that he "managed, operated, controlled, collected and distributed the Candy Club's money and funds." *Hartigan,* 149 *Ill.App.3d* at 501, 103 *Ill.Dec.* at 169, 501 *N.E.2d* at 191.

Similarly, in this matter, JLL was acting as a fiduciary for the funds that were to be collected and shared by JLL pursuant to the Greenstar Agreement as it is undisputed that JLL

managed, operated, controlled and distributed the money and funds earned from the IntelliCommand Platform and software. (Am. Comp. ¶ 106)

However, even if this Court determines that Plaintiffs must show that a legal remedy would be inadequate, Plaintiffs are still entitled to an accounting. In *ABM Marking, Inc. v. Zanasi S.R.L.*, 353 *F.3d* 541 (2003), a seller of ink for ink-jet printers commenced a breach of contract action against a seller of printers, for breach of the parties' oral distributorship agreement, whereby each party agreed to purchase the other party's product, and the ink seller would distribute the defendant's printers.  The Court determined that there was no adequate legal remedy available because (Plaintiff) failed to keep records of the royalties owed.  The Court stated that:

> The evidence at trial reveals a disturbing disparity between estimates of the royalties owed and an absence of solid evidence of the actual amount.[1] Additionally, the district court found that by failing to keep accurate records of royalties, ABM engaged in fraud. Given the lack of definite evidence and the fact that the lack of evidence is due to ABM's poor record-keeping, we agree with the district court and find that the court did not abuse its discretion in allowing for an accounting.

*ABM* is analogous to this matter. JLL has failed to provide accurate records to Plaintiffs as to the amounts owed by JLL; JLL defrauded them by withholding information as to revenues from the integration of IntelliCommand with other JLL technological offerings and JLL was covering it up by failing to conduct meetings, etc. (Am. Comp. ¶¶ 35, 55-58, 62, 98) Further, JLL withheld critical information from the appraiser. (Am. Comp., Ninth Count) For these reasons, Plaintiffs are entitled to an accounting or the equivalent via discovery.  Further, if an inadequate remedy at law is required to be established, Plaintiffs should be permitted the opportunity to establish it.

---

[1] In this case, the Plaintiff claimed royalties totaling approximately $138.00, whereas Defendant approximated royalties owed at $16,000.00.

Additionally, Defendant's reliance on *Kempner Mobile Electronics Inc. v. Southwestern Bell Mobile Systems*, 428 *F.3d* 706 (7th Cir. 2005) is misplaced. In *Kempner*, the Court in denying the request for an accounting also indicated that:

> Kempner never pled a claim for accounting, but instead waited until receiving a verdict on liability to request an accounting. We find that this case is nothing more than a garden-variety contract dispute. Indeed, damages in this case are not speculative, and the amount of damages is neither difficult nor impossible to measure. Furthermore, all of the accounting information pertinent to Kempner's claims could and should have been revealed through discovery, and there is no showing that the "accounts between the parties" are of such a "complicated nature" that only a court of equity can satisfactorily unravel them. *Id.*
> Similarly, the Defendant's reliance on *Melikhov v. Drab*, No. 16 C 9332, 2017 *WL* 3234808

at *7 (N.D. Ill. July 31, 2017) is misplaced. In *Melikhov*, the Court in denying the claim for an accounting held that there the complexity was not present. In contrast, here, JLL  manages many buildings with a total square footage of more than two billion (2,000,000,000) square feet. (Am. Comp. ¶ 9 ).The dollars associated with its sales of Plaintiffs' platform and software would be complex as it would be sold among many sectors (data centers, general offices, hotels, manufacturing, retail, hospitals, warehouses, labs). (Am. Comp. ¶ 10 ) Thus, this case involves the type of "complexity" that would require an accounting. In the alternative, as plead in the Amended Complaint, Plaintiffs are entitled to audits. (Am. Comp. ¶ 107 )

## E. GOOD FAITH AND FAIR DEALING ARE SUBSUMED INTO BREACH OF CONTRACT CLAIM

It is well settled that "the obligation to deal in good faith is implied by Illinois law into every contract and breach of that duty is simply a breach of the underlying contract." *Batteast Const. Co. v. Pub. Bldg. Comm'n of Chicago*, 195 *F. Supp. 2d* 1045, 1051 (N.D. Ill. 2001) *quoting Industrial Specialty Chems., Inc. v. Cummins Engine Co. Inc.,* 902  *F.Supp*.  805,  811

(N.D.Ill.1995); *Banco Del Estado v. Navistar Int'l Transp. Corp.,* 942 *F.Supp.* 1176, 1179 (N.D.Ill.1996); *LaScola v. U.S. Sprint Comm.,* 946 *F.2d* 559, 565 (7th Cir.1991)

A cause of action for the breach of the covenant of good faith and fair dealing may be subsumed into a breach of contract claim. *Typpi v. PNC Bank, Nat'l Ass'n*, 2014 *WL* 296035, at *3 (N.D. Ill. Jan. 27, 2014); *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 2009 *WL* 1329217, at *6 (N.D. Ill. May 13, 2009), aff'd. 692 *F.3d* 580 (7th Cir. 2012); *Snap-On Inc. v. Ortiz*, 1999 *WL* 592194, at *13 (N.D. Ill. Aug. 3, 1999) Here, as noted above, in addition to an implied covenant of good faith and fair dealing, the PCI Agreement and the Greenstar Agreement expressly provide that JLL will treat PCI and Greenstar "based on the principle of fair and honest dealings at all times and in all ways." ( Am. Comp. ¶¶ 13, 33, 34, 41, 42, 99)

The Second and Sixth Counts of the Amended Complaint allege bad faith breach of contract and fraud.   The bad faith breach of contract has been pled with adequate specificity as a review of the Statement of Facts and paragraphs quoted in the breach of contract sections above clearly demonstrate.  Again, it is hard to imagine a greater bad faith claim than that a party breached contracts as part of a plan to steal the other parties' assets.

As to fraud, Fed. R. Civ. P. 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Here, the Amended Complaint clearly establishes the circumstances constituting JLL's fraudulent behavior. As set forth in the Statement of Facts and as quoted above, JLL entered into agreements with PCI and Greenstar in an effort to steal their assets and employees. JLL "defrauded PCI by using PCI's Platform for other technology offerings without so advising PCI and/or by planning on so using PCI's Platform.  In so doing, JLL would be able to avoid creation of work orders and also avoid compensating PCI because

27

PCI had no knowledge of what JLL was doing." (Am. Comp. ¶75) "PCI was damaged by JLL's fraud in that JLL started using the Platform without compensating PCI for same." (Am. Comp. ¶77). As to Greenstar, the Amended Complaint alleges that:

> 98.  In addition, JLL defrauded Greenstar by withholding that the Platform was being used in connection with other JLL technology offerings; by the actions indicated above by which JLL intentionally sought to keep Greenstar from knowing what was actually happening as to the Platform and by its intentional efforts to "steal" the Platform and Software.  JLL knew that it was withholding information to which Greenstar was entitled, which resulted in such information being false; it intended that Greenstar rely thereon and Greenstar did reasonably rely thereon with the result that it incurred damages in the form of far less revenue being allocated to IntlliCommand which impacted the amounts to which it was entitled as well as the valuation of the IMT.

In paragraph 101, the Amended Complaint alleged that the fraud "caused extensive damages to Greenstar in the form of lost revenues."  The additional allegations as to the fraud claims sounding in tort are addressed below.

### F.  SPECIFIC PERFORMANCE

Illinois cases refer to specific performance as a "cause of action" with distinct elements. See, e.g., *Happy R Sec., LLC v. Agri-Sources, LLC*, 988 *N.E.2d* 972, 981 (Ill.App.Ct. 2021) ("To state a cause of action for specific performance, the plaintiff must allege and prove the following elements: (1) the existence of a valid, binding and enforceable contract; (2) the compliance by plaintiff with the terms of his contract or the fact that he is ready, willing and able to perform his part of the contract; and (3) the failure or refusal by the defendant to perform his part of the contract"); *Ansonia Properties, LLC v. Vasilj*, 2015 *IL App (1st)* 133846-U, ¶ 23, as modified (June 4, 2015) (same); *Ladien v. Presence RHC Corp.*, 2017 *IL App (1st)* 152778-U, ¶ 22 (June 30, 2017); *Dodd v. Rotterman*, 330 Ill. 362, 370 (1928); *Baker v. Puffer*, 299 *Ill.* 486, 490 (1921) (same).  As stated in *Lagen v. United Cont'l Holdings, Inc.*, 920 *F. Supp. 2d* 912, 918–19 (N.D. Ill. 2013):

Count IV of Plaintiff's Complaint purports to state a claim for specific performance. In its Motion to Dismiss, Defendants argue that this claim must be dismissed because specific performance is not an independent cause of action. Plaintiff responds clarifying that Count IV is not intended to be an independent cause of action, but instead is only an equitable remedy sought for Plaintiff's breach of contract claim. The Court accepts Plaintiff's explanation and finds Plaintiff's request for specific performance as a form of relief permissible.

Hence, even if this Court rules that specific performance is not an independent cause of action,

Plaintiff must be permitted to seek this relief as part of its breach of contract claim.

## G.  BAD FAITH/FRAUD

Illinois law expressly permits recovery of punitive damages for bad faith breach of contract where the facts upon which the claim for breach of contract is based are also the basis of an independent tort, such as fraud. *In Bank of Illinois in Mt. Vernon v. Bill's King City Stationery, Inc.,* 198 *Ill. App. 3d* 434, 436–37 (1990), the court stated:

> Punitive damages may be awarded in cases of fraud, actual malice, deliberate violence or oppression, when the defendant acts willfully, or with wanton disregard for the rights of others. Punitive damages are in the nature of punishment, designed to deter the defendant and others from such conduct in the future.

Where the breach constitutes an independent tort for which punitive damages are recoverable, they are recoverable in a breach of contract case. *Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 *Ill.2d* 87 (1986); *Skokin v. Blackman, Kallick and Co.*, 184 *Ill.App.3d* 873 (1989); *Salvator v. Admiral Merchants Motor Freight*, 156 *Ill.App.3d* 930 (1987); *Wallace v. Prudential Insurance Co.*, 12 *Ill.App.3d* 623, 629–30 (1973); *Restatement (Second) of Contracts* § 355 (1977).

In order to support the existence of an independent tort, a plaintiff need only allege facts which would bring its claim for punitive damages within a recognized tort theory. *Illinois Sterling, Inc. v. KDI Corp.*, 33 *Ill.App.3d* 666 (1975); *Bank of Illinois in Mt. Vernon v. Bill's King City Stationery, Inc.*, 198 *Ill. App. 3d* at 436–37; *Cox v. Doctor's Assocs., Inc.,* 245 *Ill. App. 3d* 186, 220 (1993); *3Com Corp. v. Elecs. Recovery Specialists, Inc.*, 104 *F. Supp. 2d* 932, 943 (N.D. Ill. 2000) ("[P]laintiff properly has alleged that 'the conduct causing the breach' of contract may also

be "a tort for which punitive damages are recoverable"); *Miyano Mach. USA, Inc. v. Zonar*, 1994 *WL* 233649, at \*7 (N.D. Ill. May 23, 1994) ("Illinois does, however, recognize a cause of action in tort arising out of a breach of contract if the conduct constitutes an independent tort"); *Sharpe v. Jefferson Distrib. Co*., 1998 *WL* 786397, at \*3 (N.D. Ill. Nov. 6, 1998).

The elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiffs reasonable reliance on the truth of the statement; and (5) plaintiffs damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co., Ltd*., 174 *Ill.2d* 482, 496 (1997). Those elements are expressly included in the Amended Complaint. (See, <u>e.g.</u>, Am. Comp. ¶98) Here, as set forth above as to the breach of contract fraud claims, the Amended Complaint expressly alleges that JLL defrauded Greenstar and PCI with respect to its use of the IntelliCommand platform with other technological offerings in that it failed to report such use and/or substantial revenues attributable at least in part to that platform. (Am. Comp. ¶¶ 35, 55-58, 62, 98)  Further, JLL intentionally withheld information as to same from the appraiser which caused the appraiser to substantially underreport the value. (Am. Comp., Ninth Count) Also, JLL planned to essentially steal PCI's and then JLL's platform and software for years. (Am. Comp. ¶ 62).  Paragraph 98, as quoted above, itself alleges the elements of fraud pursuant to Illinois law. Further, Paragraphs 81 and 103 allege that JLL's fraud and/or bad faith conduct is set forth in detail in the Amended Complaint and "was malicious willful, wanton and/or oppressive" and that it caused PCI and Greenstar to incur substantial damages. The adding of malice, willful, wanton and/or oppressive conduct renders it clearly within tortious conduct under Illinois law.

## <u>CONCLUSION</u>

For the reasons set forth herein, it is respectfully submitted that JLL's motion to dismiss should be denied in its entirety.

DREIFUSS BONACCI & PARKER, PC
Attorneys for Plaintiffs

By:   _David C. Dreifuss_